Century Plastic Corp. *vs.* Tupper Corporation.

Worcester.  September 26, 1955. — February 6, 1956.

Present: Qua, C.J., Ronan, Spalding, Williams, & Counihan, JJ.

*Release. Mistake. Equity Jurisdiction,* Reformation, Mistake.

Reported evidence in a suit in equity did not show to be plainly wrong a finding by the judge that the parties, in settling actions at law pending between them respecting goods sold by the plaintiff to the defendant four years previously and in exchanging general releases, did not intend that the defendant should be released from liability to the plaintiff upon a claim for further goods sold shortly before such settlement by the plaintiff to a concern which had been taken over by the defendant and was being operated as a department of the defendant's business, and a decree ordering that the release given by the plaintiff be reformed so as to exclude the claim of the plaintiff for the latter goods was proper.

Bill in equity, filed in the Superior Court on October 3, 1951.

The suit was heard by *O'Brien,* J.  The final decree ordered that a release from the plaintiff to the defendant dated November 21, 1950, "be reformed by inserting therein 'the said release shall not include any claim the . . . [plaintiff] has against . . . [the defendant] for merchandise delivered in September and October of the year 1950.'" The defendant appealed.

*John P. Dunn,* for the defendant.

*Henry E. Manning & Joseph Goldberg,* for the plaintiff, submitted a brief.

Ronan, J.  This is an appeal from a final decree ordering the reformation of a general release dated November 21, 1950, given by the plaintiff to the defendant by excluding therefrom certain claims which the plaintiff had against the defendant on the ground that the failure to exclude them from the general release was due to the mutual mistake of the parties.  The suit is here with a report of the evidence and a report of the material facts.

The plaintiff, a manufacturer of plastic goods, whose factory was in Hudson, delivered to the defendant in 1946 goods and merchandise of the alleged value of $2,374.50. Other than $499.50, the defendant made no further payment. The last check sent to the plaintiff which was for $99 was returned to the defendant at about the time the release was signed. The plaintiff then brought an action to recover the balance and the defendant, contending that the goods were defective, brought a cross action for breach of warranty. The parties conferred at the court house in May, 1950, when the cases were nearly reached for trial. The defendant's offer of $1,000 was rejected and the conference ended without settlement.

Sometime before this conference, the defendant had purchased the inventory, occupied the quarters, and retained most of the employees of a corporation located in New York and known as Hostess Home Accessories, Inc. The defendant subsequently set up what it acquired from this New York concern as a department and conducted business under the name of Tupper Corporation, Hostess Division. Among the employees retained by the defendant when it took over the assets of the New York corporation was one Porcari who had been and continued as purchasing agent. He had done business previously with the plaintiff. Porcari early in September, 1950, had ordered goods from the plaintiff but Hostess Home Accessories, Inc., was slow in paying its previous bills. The plaintiff was not anxious to sell goods to that concern. Porcari told the plaintiff's president that the defendant had taken over Hostess Home Accessories, Inc., and was going to pay all the latter's debts, that the defendant was going to operate Hostess Home Accessories, Inc., as a separate entity, but that the bills were going to be paid or guaranteed by the Tupper Corporation. The plaintiff's president had read in a trade paper that the defendant had taken over this New York concern. The plaintiff accepted the orders from Porcari and delivered the goods to the New York plant in September and October, 1950. The goods were inspected by Porcari and found to be

satisfactory. The invoices which amounted to $1,796.63 were approved by Porcari and sent to the defendant's headquarters in this State where they came to the attention of the defendant's president and treasurer, one Earl S. Tupper.

On November 20, 1950, when the action and cross action were about to be reached for trial, the attorneys for the parties and the plaintiff's president and treasurer met at the court house. Tupper, who was not present, authorized his attorney to offer $1,300 which was done in the course of the conference, and the plaintiff accepted the offer. Agreements for judgment were filed and general releases were drafted by the defendant's attorney, executed the next day, and exchanged between the parties. The releases were executed by the plaintiff and by one Sharaf, its president and treasurer, and one Jaffe, its vice-president, and ran to Tupper Plastics, Inc., and Earl S. Tupper. Subsequently, a new release running also to Tupper Corporation was substituted and given to the defendant. Hostess Division was not mentioned in either release.

The plaintiff wrote to the New York concern on November 20, 1950, requesting payment of the goods sold in September and October, 1950, and Porcari after consulting with the controller, at Hostess, one Howzdy, replied under the date of December 1, 1950, that a check would be forwarded in the very near future.

The issue here is whether the general release given by the plaintiff was intended to include both the claims for 1946 and 1950 or only the 1946 claims.

The release given by the plaintiff to the defendant was couched in the broadest language and was free from ambiguity. It contained nothing to indicate that it did not embrace within its terms all claims which the plaintiff had against the defendant. *Gold* v. *Boston Elevated Railway*, 244 Mass. 144, 147. *Willett* v. *Herrick*, 258 Mass. 585, 594. *Radovsky* v. *Wexler*, 273 Mass. 254, 257. *Tupper* v. *Hancock*, 319 Mass. 105, 108. In the absence of fraud, accident, or mistake it could not be reformed or rescinded. *O'Reilly's Case*, 258 Mass. 205, 208. *Levin* v. *Bernstein*, 269 Mass.

542, 543. *Perkins's Case,* 278 Mass. 294, 301. The plaintiff does not seek relief on any ground other than mutual mistake. The mistake of one party is not adequate ground for relief. The mistake must relate to the same subject matter and be shared in by both parties. *Page* v. *Higgins,* 150 Mass. 27. *Barrell* v. *Britton,* 252 Mass. 504, 508. *Martin* v. *Jablonski,* 253 Mass. 451, 453.

There was no question concerning the quantity, quality, or price of the goods shipped to Hostess Division, or that they were not used in the usual course of its business. Tupper knew as early as October 25, 1950, of the receipt of these goods by Hostess. He testified that Porcari had no authority to purchase them but the ostensible authority was his real authority. *Brooks* v. *Shaw,* 197 Mass. 376, 380. *Danforth* v. *Chandler,* 237 Mass. 518, 522. He also testified that he did not recognize the plaintiff's claim for these goods. He never notified the plaintiff that the defendant would not pay the bill. On the other hand, there was evidence that the plaintiff did not know the arrangement between the defendant and Hostess Division. The latter concern had assumed three names — Hostess Home Accessories, Inc., Tupper Corporation, Hostess Division, and Hostess Division, Inc. — within a year after the defendant took it over.

The 1950 sales were billed by the plaintiff in various ways as Hostess Home Accessories, Inc., Hostess Home Accessories, Inc. Div., Tupper Corp., and Tupper Corp., Hostess Division. When the goods were delivered in New York to the Hostess Division in 1950 the plaintiff believed that it was a separate corporation which was controlled and owned by Tupper Corporation. When the plaintiff's president executed the release he never thought that the goods which had been sold to Hostess had anything to do with the pending action against Tupper Corporation which was being settled. The evidence amply warranted the finding that in executing and delivering the release the plaintiff did not intend to settle anything other than the action and cross action which were then pending.

Tupper had offered in May to settle the action and cross

action which were pending for $1,000 and the offer was refused by the plaintiff. Six months afterwards when the plaintiff was ready and waiting for trial of this action and cross action Tupper authorized his attorney to offer $1,300 in settlement, which was accepted. Almost $1,800 worth of goods had been delivered by the plaintiff to Hostess Division since the previous offer. There is nothing contained in the evidence that would seem to cast any doubt upon the genuineness of this claim. So far as appears from the record no mention was made of any claim for the 1950 sales during the negotiations prior to signing the releases. Perhaps it was not mentioned by the plaintiff's president because he never thought that the items that were furnished had anything whatsoever to do with the action against Tupper Corporation. The judge could find from the circumstances, notwithstanding the testimony of Tupper, that the offer to pay $1,300 was made to settle the pending litigation and not also the 1950 sales to Hostess. We cannot say that the judge was plainly wrong in finding as he did that it was the intention of Tupper to secure a release from the 1946 transaction "relative to which actions were pending in the Superior Court, and it was not the intention of the parties to release the defendant from liability on the September and October, 1950, transactions."

We need not pause to decide whether upon the evidence the findings may also be supported upon the basis that the defendant knew that the plaintiff believed that it was only settling the law actions. "A mistake made by one party to the knowledge of the other is equivalent to a mutual mistake." *Mates* v. *Penn Mutual Life Ins. Co.* 316 Mass. 303, 306. *Wareham Savings Bank* v. *Partridge,* 317 Mass. 83, 84. *Eno* v. *Prime Manuf. Co.* 317 Mass. 646, 650.

The release given by the plaintiff to the defendant was executed in behalf of the plaintiff by one Sharaf, its president and treasurer, and one Jaffe, its vice-president. Sharaf testified that he signed the release without reading it other than noticing that it contained the figure $1,300 but that in signing it he had confidence in his attorney. There was

nothing, however, to show that this attorney who was appearing in the pending actions which the parties were attempting to settle ever knew of the sales in 1950 to Hostess. The release which had been drafted by the defendant's attorney made no mention of Hostess or any trade name containing that word. There was nothing to indicate that Jaffe did not read the release before he executed it. Unless one had some knowledge of the association between the defendant and Hostess Division, he might well think that Hostess had nothing to do with the cases they were adjusting or with any transaction in which they were engaged. It is, of course, true that ignorance through negligence does not relieve a party from his contractual obligations, *O'Reilly's Case,* 258 Mass. 205, 208–209, *Willett* v. *Herrick,* 258 Mass. 585, 589, *Perkins's Case,* 278 Mass. 294, 300–301; but it is also true that the setting in which the release was executed as shown by a careful reading of the evidence demonstrates that whatever negligence accompanied the signing did not amount to inexcusable negligence barring the plaintiff from maintaining the suit.

*Decree affirmed with costs
of the appeal.*