Gunther SCHMID, Erich Stahlschmidt, and ATS Leichtmetallrader, a corporation under the laws of the Federal Republic of Germany, Plaintiffs,

v.

The NATIONAL BANK OF GREECE, S.A., John Christopher, Nicholas A. Abraham, and John S. Spiliakos, individually, as partners and joint venturers, and First Boston Arabian Corporation, as it may be a Massachusetts Corporation, Defendants.

Civ. A. No. 84–2559–C.

United States District Court, D. Massachusetts.

Nov. 14, 1985.

Edgar L. Kelley, William Burke O'Leary, North Andover, Mass., for plaintiffs.

Nicholas A. Abraham, Abraham-Hanna, P.C., Boston, Mass., for First Boston Arabian Corp.

James R. DeGiacomo, Roche, Carens & DeGiacomo, Boston, Mass., for Christopher and Nat'l Bank of Greece.

Erik Lund, Posternak, Blankstein & Lund, Boston, Mass., for John S. Spiliakos and Nicholas Abraham.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action brought by Gunther Schmid and Erich Stahlschmidt, citizens of the Federal Republic of Germany, and ATS Leichtmetallrader (hereinafter "ATS"), a corporation jointly owned by Schmid and Stahlschmidt and organized and existing under the laws of the Federal Republic of Germany. The plaintiff Erich Stahlschmidt is now deceased. The defendants are the National Bank of Greece (hereinafter the "Bank"), an institution which conducts its business in Boston, Massachusetts, John Christopher, Senior Loan Officer of the Bank, First Boston Arabian Corporation (hereinafter "F.B.A.C."), a Massachusetts corporation, and Nicholas A. Abraham and John S. Spiliakos, attorneys licensed to practice law in the Commonwealth of Massachusetts. The complaint alleges breach of contract, fraud, deceit, unfair and deceptive acts, conspiracy, conversion and breach of fiduciary duties on the part of all the defendants, and prays for $100,000 in actual damages, treble damages under Massachusetts General Laws § 93A, attorney's fees and costs from all defendants, the imposition of constructive trusts and the attachment of property to secure payment.

The plaintiffs claim jurisdiction under 28 U.S.C. § 1332(a)(2) because the complaint seeks an amount exceeding $10,000 and is between citizens of a foreign state and citizens of a state. The matter is now before the Court on motions for summary judgment filed by the Bank, John Christopher, Nicholas A. Abraham, John S. Spiliakos, and F.B.A.C.

A federal court may grant summary judgment only if the moving party or parties have shown that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering the defendants' motions for summary judgment, the Court has examined the record in detail, and has viewed the facts in the light most favorable to the plaintiffs. *Raskiewicz v. Town of New Boston,* 754 F.2d 38 (1st Cir.1985).

This case involves complex and sometimes incredible facts. The key figure is an individual from the United Arab Emirates named Ala Fadili Al Tamimi (hereinafter "Ala Fadili"). In early September, 1981 Ala Fadili, who is not a party to this action, effectively defrauded the plaintiff Gunther Schmid of $100,000. Ala Fadili was president, treasurer and director of F.B.A.C. at all pertinent times. The plaintiffs have been unable to recover the $100,000 from Ala Fadili, who is serving a prison term in Italy. The plaintiffs, alleging various wrongdoing by the defendants in connection with Ala Fadili's defrauding of Schmid, now seek to recover $100,000 from each of the defendants and, in addition, treble damages, attorneys' fees and costs

pursuant to Mass.Gen.Laws Ann. ch. 93A, §§ 2 and 11.

The pleadings, affidavits, depositions and admissions on file establish the following facts: The defendant Abraham first met Ala Fadili in Boston during June, 1980 when Ala Fadili became a client of Abraham's law firm, Abraham & Spiliakos. In April, 1981 Abraham and Ala Fadili formed the First Boston Arabian Corporation, with Ala Fadili acting as president, treasurer and director and Abraham as vice-president, clerk and director. F.B.A.C.'s Articles of Incorporation were approved by the Secretary of State of the Commonwealth of Massachusetts and became effective on April 15, 1981. Abraham and Spiliakos both served as counsel to F.B.A.C. during the time relevant to this action. F.B.A.C. was created to function as a low interest loan brokerage corporation. Ala Fadili represented to Abraham and others that he was authorized by several ruling sheiks from the United Arab Emirates to invest $1 billion in real estate mortgages throughout the United States and elsewhere.

During the summer months of 1981, F.B.A.C. concluded letters of intent with various parties whereby F.B.A.C. agreed to lend these parties various sums of money, totalling approximately $150 million. In exchange for these loans, F.B.A.C. was to receive substantial finders fees. A material term of the letters of intent was that the borrowers deposit a substantial part of the finders fee in advance in a F.B.A.C. account. The deposit was to serve as an earnest payment which would be refunded should F.B.A.C. be unable to procure the requested financing by the stipulated closing date of the loan.

In late August, 1981 Henri Sauter, an individual known to both Gunther Schmid and Ala Fadili, arranged for a meeting between Schmid and Ala Fadili to take place in Munich, Germany. Schmid was interested in obtaining a loan to finance the construction of a factory for ATS in Zug County, Switzerland. Spiliakos accompanied Ala Fadili to the meeting to help Ala Fadili evaluate Schmid's proposal. Spiliakos' only role at this meeting was to listen to the discussions and evaluate any proposals made. He made no representations to Schmid regarding Ala Fadili's ability to go through with the transaction under discussion.

Ala Fadili promised to procure an $8 million loan to Schmid in exchange for Schmid's promise to pay a $400,000 finders fee and to wire $100,000 immediately to an account in Ala Fadili's name at the Dresdner Bank in Munich as an earnest payment. A few days later, Schmid wired $100,000 to Ala Fadili's account in the Dresdner Bank. Ala Fadili then wrote and signed a letter to Schmid, dated September 9, 1981, specifying the terms of the agreement.

Two months earlier, in July, 1981, Ala Fadili and Abraham had opened two savings accounts and one checking account, in the name of F.B.A.C. at the Bank of Greece in Boston. One of the savings accounts, account number 531–446–3, was the account into which the earnest payments of prospective clients of F.B.A.C. were deposited. In opening the accounts, F.B.A.C. filed a certification of officers of the corporation, listing Ala Fadili as president and treasurer and Abraham as vice-president and clerk. F.B.A.C. also filed corporate resolutions for opening and maintaining corporate accounts which provided that either the president or vice-president, "singly", could effect transfers or withdrawals from any of the accounts. The Bank's rules and regulations in effect in September, 1981 allowed customers to make deposits and withdrawals without presenting their account passbooks. In his affidavit Abraham stated that he had possession of the passbook for account No. 531–446–3 at this time and believed that he alone had the authority to withdraw funds from the accounts.

On or about September 8, 1981 Ala Fadili went to the Bank with a check drawn on the Dresdner Bank, payable to himself, in the sum of $98,530.12. This $98,530.12 was part of the $100,000 that Schmid had wired to his Dresdner Bank account. Ala

Fadili requested John Christopher, an officer of the Bank, to clear the check immediately, but was told by Christopher that the check would take four days to clear. Christopher then granted Ala Fadili's request to deposit the check into F.B.A.C.'s savings account No. 531–446–3, which had a balance in excess of $100,000, and transfer $100,000 from that account to his personal checking account. The Dresdner Bank check subsequently cleared without any problems.

On September 12, 1981 Abraham received a statement from the Bank informing F.B.A.C. of these transactions. Abraham did not try to contact Ala Fadili, who was in West Germany preparing to meet with Schmid to discuss another loan to Schmid for the construction of a hotel in the Bahamas. On September 14 Abraham and Spiliakos left for Munich where they planned to meet with Ala Fadili on September 15 to close a $75 million loan transaction F.B.A.C. had with another West German, Wolfgang Jurgens. Ala Fadili failed to show up in Munich to close the Jurgens deal and he never procured the $75 million for Jurgens as agreed. Instead, Ala Fadili transferred to his own account at the Irving Trust Co. in London the $870,000 which Jurgens had paid to Ala Fadili. Ala Fadili never made the loan to Jurgens and never returned Jurgens' $870,000 earnest payment. He also never made the loan to Schmid and never returned the $100,000 he took from the F.B.A.C. account on September 8. Ala Fadili embezzled both of these sums, defrauding both Schmid and Jurgens. After Abraham realized that Ala Fadili intended to convert the earnest payments of Schmid and Jurgens, he retained London counsel to attach Ala Fadili's personal funds at the Irving Trust Company in London. The London attorneys were successful in attaching $1.2 million on September 21, 1981. The next day, September 22, 1981, Abraham withdrew $169,502.10 from F.B.A.C. account No. 531–446–3 at the Bank of Greece and placed it in an account at the South Boston Savings Bank. This money was later paid to F.B.A.C. clients with claims against the company.

Ala Fadili then retained Edgar L. Kelley, Esq., a Massachusetts attorney, to work out a settlement with Abraham which would dissolve the English attachment of his funds. Pursuant to his retainer, Kelley drafted a document to be signed by persons with possible claims against Ala Fadili or F.B.A.C. That document released Ala Fadili, F.B.A.C., Abraham and Spiliakos from all claims related to these events. On October 19, 1981 Henri Sauter, with a power of attorney from Schmid, signed the release on behalf of Schmid. The document released Ala Fadili, F.B.A.C., Abraham and Spiliakos from all claims Schmid might have against them. The parties to this action have stipulated that this release was duly executed by Sauter on Schmid's behalf.

Neither Abraham nor Spiliakos was present when the release was prepared or signed and neither individual had any communications with Schmid or Sauter in regard to the release. Schmid agreed to sign the release in exchange for an unsecured note for $100,000 from Ala Fadili, an unsecured guarantee from Jurgens and F.B.A.C.'s agreement to dissolve the attachment in London. On or about November 19, 1981, after receiving the release, Abraham authorized F.B.A.C.'s London attorneys to dissolve the attachment in London. In exchange for dissolving the attachment, Abraham received from Ala Fadili $142,000 which was used to settle claims of F.B.A.C. creditors whom Ala Fadili had defrauded and claims of Abraham and Spiliakos personally. The remainder of the funds that had been attached, it was understood, were to be used to satisfy the claims of Schmid and Jurgens. Ala Fadili defaulted on his note to Schmid, and Jurgens, who also received no payment from Ala Fadili, defaulted on his guarantee to Schmid.

The Court will address the Bank and Christopher's motion for summary judgment first and then will address the motions filed by Abraham and Spiliakos and F.B.A.C. together.

## I. *The National Bank of Greece and John Christopher*

The plaintiffs claim that the Bank and Christopher are liable to them for breach of contract, negligence, violation of fiduciary obligations owed to them, and unfair and deceptive acts and practices under Mass. Gen.Laws Ann. ch. 93A. The crux of the plaintiffs' allegations against the Bank and Christopher is that F.B.A.C. account No. 531–446–3 at the Bank was an escrow account which created a fiduciary obligation on the Bank and Christopher to the plaintiffs to protect their money paid to Ala Fadili, and that the Bank and Christopher violated this obligation by allowing Ala Fadili to transfer $100,000 out of the account into his personal account on September 8, 1981. The plaintiffs further allege that it was a violation of the Bank's fiduciary obligation to allow Abraham to withdraw funds from the account on September 22, 1981, after he concluded that Ala Fadili intended to defraud Schmid, Jurgens and others.

The record shows that at all relevant times the Bank and Christopher acted in accordance with the terms of the Bank's agreement with F.B.A.C.. When F.B.A.C. opened the account in July, 1981, it provided the Bank with corporate resolutions, and a certification of officers which listed Ala Fadili as president and treasurer, and Abraham as vice-president and clerk, and provided that *either* the president *or* vice-president, "singly," could make withdrawals. These documents were signed by both Ala Fadili and Abraham. The Bank's rules and regulations in effect in September 1981 provided that customers could make withdrawals without presenting their account passbooks. Shortly after the account was opened, F.B.A.C. provided the Bank with a form authorizing transfers by telephone or on verbal order of an authorized signer of the account. Both Ala Fadili and Abraham made withdrawals after the account was opened.

■ The plaintiffs direct the Court's attention to affidavits of Abraham and Spiliakos in which both men state that it was their understanding that only Abraham had the authority to withdraw funds from the F.B.A.C. account. In his affidavit Abraham also states that he understood that funds could not be withdrawn from the account without presentation of the account passbook, which was in a safe in his office. What Abraham and Spiliakos subjectively understood is irrelevant to what the Bank's contractual duties were regarding the account. The express terms of the agreement, which clearly state that *either* Ala Fadili *or* Abraham had the authority to withdraw funds and the Bank's rules and regulations allowing withdrawals without a passbook, controlled the obligations of the Bank and Christopher.

■ The parties dispute whether the F.B.A.C. account was a savings account or an escrow account. The plaintiffs claim that it was an escrow account and that the Bank negligently failed to perform its fiduciary obligation to them to protect the plaintiffs' money. The Bank offers uncontested affidavits of Bank officers that at no time was the account designated an escrow account. Whether the account was an escrow account or a regular savings account is immaterial. A depository in escrow is bound to act in strict compliance with the terms of the escrow agreement. The escrow agreement or instructions constitute the full measure of the obligation assumed by the escrow holder and owing to the parties. *See, e.g. Blackburn v. McCoy,* 1 Cal.App.2d 648, 37 P.2d 153 (1934). Because Christopher, acting as an agent of the Bank, did not violate the terms of the agreement between F.B.A.C. and the Bank when he allowed Ala Fadili to transfer $100,000 out of the account on September 8, 1981, and because the Bank also acted in accordance with this agreement when it allowed Abraham to withdraw $169,502.10 from the account on September 22, 1981, the plaintiffs' claims of breach of contract, negligence and breach of fiduciary obligations against the Bank and Christopher have no basis in fact and must be dismissed. Furthermore, because the facts show clearly that neither the Bank nor

Christopher participated in any wrongdoing, the Court rules that the plaintiffs' claims under Mass.Gen.Laws Ann. ch. 93A should also be dismissed. *See Commonwealth v. DeCotis*, 366 Mass. 234, 316 N.E.2d 748 (1974).

## II. *Nicholas A. Abraham, John S. Spiliakos and First Boston Arabian Corporation*

The plaintiffs allege fraud, deceit, breach of contract, conversion, negligence, breach of fiduciary obligations, unfair and deceptive acts and practices, under Mass.Gen. Laws Ann. ch. 93A, against Abraham, Spiliakos and F.B.A.C. The plaintiffs also claim that F.B.A.C. was a "sham" corporation and that Ala Fadili and Abraham therefore should be held jointly and severally liable as partners for the plaintiffs' losses.

■ The plaintiffs have pointed to nothing in the record to support their contention that F.B.A.C. was a "sham" corporation. F.B.A.C.'s Articles of Incorporation, which are part of the record, were approved by the Secretary of State of the Commonwealth of Massachusetts and became effective on April 15, 1981. The plaintiffs in their memorandum allege that Abraham admitted that no stock was issued by F.B.A.C. and that no meetings of the board of directors or the two stockholders, Abraham and Ala Fadili, were ever held. However, the plaintiffs fail to direct the Court's attention to any such admissions by Abraham. Moreover, an examination of Abraham's affidavit and deposition in this case reveals sworn statements by Abraham directly contrary to the plaintiffs' allegations. In sum, the plaintiffs have failed to direct the Court to any evidence in the record or any legal precedent which would enable the Court to conclude that there is a genuine issue of material fact whether F.B.A.C. was a valid corporate entity during the time period in question.

■ The plaintiffs, again without pointing out to the Court any evidence in support of the claim as is characteristic of all plaintiffs' contentions regarding the existence of questions of material fact herein, allege that Abraham and Spiliakos fraudulently and deceitfully induced the plaintiffs to wire the $100,000 earnest payment to Ala Fadili. Under Massachusetts law, to establish a cause of action for fraud and deceit, the plaintiffs would have to offer proof that the defendants made a false representation of a material fact · with knowledge of its falsity for the purpose of inducing the plaintiffs to act thereon, and that the plaintiffs relied upon the representation as true and acted upon it to their damage. *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703, 322 N.E.2d 768 (1975). Abraham's uncontradicted statements in his affidavit and his deposition testimony are that he never heard of Schmid until September 15, 1981, approximately two weeks after Schmid wired the $100,000 to Ala Fadili's personal account. Abraham also testified that he never made any representations to Schmid. The plaintiffs have offered no evidence to controvert these statements by Abraham. Accordingly, I rule that Abraham is entitled to summary judgment as a matter of law on the plaintiffs' fraud and deceit claim.

■ Spiliakos is also entitled to summary judgment on the plaintiffs' fraud and deceit claim. Spiliakos' only contact with Schmid or Stahlschmidt was at the meeting between Ala Fadili, Schmid and Stahlschmidt in Munich in late August, 1981. In his affidavit Spiliakos states that he attended this meeting solely to evaluate the plaintiffs' proposal and he made no representations to either Schmid or Stahlschmidt. He further states that he had no communications with Schmid or Stahlschmidt after that meeting. In his deposition the plaintiff Schmid testified that Spiliakos was solely an observer at the August meeting. The plaintiffs have failed to produce any evidence that Spiliakos made representations to them which they might have relied on to their detriment.

The plaintiffs allege that both Abraham and Spiliakos were negligent in failing to protect their funds from Ala Fadili. Abra-

ham and Spiliakos move for summary judgment on this claim on the ground that they did not owe the plaintiffs a duty of care.

To succeed on a negligence claim against Abraham or Spiliakos as individuals, the plaintiffs must establish that Abraham and Spiliakos owed them a duty of care. *Brown v. Kendall*, 60 Mass. 292 (1850). The general rule is that, absent a special relationship, a person owes no duty to protect another from a third person's wrongdoing. The law has recognized special relationships in several different categories. *See, e.g. Mullins v. Pine Manor College*, 389 Mass. 47, 449 N.E.2d 331 (1983) (college has duty to exercise reasonable care to protect its students from third persons). The foremost consideration in determining whether a special relationship exists between a plaintiff and a defendant is whether the defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so. *Irwin v. Town of Ware*, 392 Mass. 745, 756, 467 N.E.2d 1292 (1984). In this case, Abraham and Spiliakos, viewed as individuals, were not in a relationship to Schmid, et al that has been recognized as "special" by the Massachusetts courts, and this Court declines to rule that such a relationship existed between the plaintiffs and Abraham and Spiliakos. Since Abraham and Spiliakos as individuals owed no extraordinary duty to the plaintiffs, the question is whether Abraham's status as a corporate officer and counsel to F.B.A.C., or Spiliakos' status as counsel to F.B.A.C., creates any special duties in either defendant to the plaintiffs. An officer of a corporation does not incur personal liability for a tort committed by the corporation or by another corporate officer merely by virtue of the office which he holds in the corporation. *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230, 235–36, 112 N.E.2d 790 (1953). Therefore, the fact that Abraham was an officer of F.B.A.C. does not impose upon him any special duty to the plaintiffs.

The Massachusetts Supreme Judicial Court has adopted the majority rule that attorneys generally do not owe a duty to non-clients. *Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148 (1983). This Court recognizes that the Massachusetts court in *Page* left the door open for courts to impose a duty upon lawyers to non-clients in situations where a lawyer knows that a non-client will rely on his services. *Id.* at 64, 445 N.E.2d 148. *See also Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967). However, the court in *Page* said that a duty should not be imposed where the lawyer is also under an independent and potentially conflicting duty to a client. *Page*, 388 Mass. at 63, 455 N.E.2d 148. The evidence in the record is clear that Abraham had no contact with the plaintiffs in his capacity as counsel to F.B. A.C.. Therefore, there was no reason for him to know that the plaintiffs would rely on his services. Moreover, even if Abraham somehow should have known that the plaintiffs intended to rely on his services, Abraham's duty to represent F.B.A.C. was certainly an independent and potentially conflicting one. The evidence is also clear that, to the extent that Spiliakos had any contact with the plaintiffs as counsel for F.B.A.C., he acted only on behalf of F.B. A.C. and had no reason to believe that the plaintiffs would rely on his services.

In their complaint the plaintiffs also allege that Abraham acted in breach of contractual duties owed to Schmid, Stahlschmidt and ATS. The plaintiffs have failed to direct the Court to any evidence of a contract between the plaintiffs and Abraham. The only possible evidence of an express contract is the letter on F.B.A.C. stationery, dated September 9, 1981, from Ala Fadili, as president of F.B.A.C., to Schmid and Stahlschmidt. Even assuming that this letter is some evidence of a valid contract between F.B.A.C. and the plaintiffs, the contract is a corporate obligation only. Therefore, Abraham cannot be held personally liable for any breach of its terms. *United States v. Normandy House Nursing Home Inc.*, 428 F.Supp. 421 (D.Mass.1977).

■ There is also no basis for inferring a contract between the plaintiffs and Abraham. Courts imply contracts at law in certain situations to avoid the unjust enrichment of one party at the expense of another. *In re D. Federico Co., Inc.*, 8 B.R. 888 (D.Mass.1981). The plaintiffs in this case paid $100,000 to Ala Fadili personally, which did not confer any benefit on Abraham. In the absence of any evidence of a benefit conferred on Abraham, the Court rules that there was no implied contract.

The plaintiffs also complain that Abraham and Spiliakos are liable for conversion of the $98,530.12 check that Ala Fadili placed in F.B.A.C.'s account No. 531–446–3 at the Bank on September 8, 1981. The plaintiffs argue that the $100,000 Ala Fadili transferred to his personal account on September 8, 1981 was not the plaintiffs' money, but rather was part of funds collected from other clients of F.B.A.C. Consequently, the $169,502.10 that Abraham withdrew from the F.B.A.C. account on September 22, 1981 included the proceeds of the $98,530.12 check deposited by Ala Fadili. Abraham placed the $169,502.10 in an account at the South Boston Savings Bank. These funds were ultimately disbursed to claimants against F.B.A.C.

■ Conversion requires the wrongful exercise of dominion over personalty, including money, to which a plaintiff has an immediate right of possession. *Morrin v. Manning*, 205 Mass. 205, 91 N.E. 308 (1910); *Marshall Vessels, Inc. v. Wright*, 331 Mass. 487, 120 N.E.2d 286 (1954). Abraham is not immune from tort liability simply because he was acting as an officer of F.B.A.C. when he withdraw the funds. *LaClair v. Silberline Mfg. Co., Inc.* 379 Mass. 21, 393 N.E.2d 867 (1979). Abraham, however, did not convert the plaintiffs' money. The plaintiffs did not have an immediate right of possession to the $98,-530.12 placed in the F.B.A.C. account on September 22, 1981. The plaintiffs surrendered their right to possess the $100,000 when Schmid wired the funds to Ala Fadili's personal account at the Dresdner Bank

in Munich late in August. By the terms of the alleged agreement between the plaintiffs and F.B.A.C., contained in the letter from Ala Fadili to the plaintiffs, dated September 9, 1981, the plaintiffs were entitled to the return of their earnest payment only if F.B.A.C. was unable to procure the loan requested by the plaintiffs within forty-five days. Therefore, when Abraham withdrew $169,502.10 from the F.B.A.C. account on September 22, 1981, F.B.A.C. not the plaintiffs, had the right to immediate possession of the plaintiffs' earnest payment. Assuming the validity of the alleged agreement between the plaintiffs and F.B.A.C. on September 22, 1981 the plaintiffs possessed only a contingent right to a refund of the earnest payment from F.B.A.C. (contingent upon F.B.A.C.'s procuring the $8 million loan within the agreed upon time period). Furthermore, Abraham did not put the monies withdrawn from the F.B.A.C. account to his own use, but rather put them in an account from which they were later distributed to F.B.A.C. clients. Accordingly, the defendants Abraham and Spiliakos are entitled to summary judgment on the plaintiffs' conversion claim. Abraham, Spiliakos and F.B.A.C. are also entitled to summary judgment on the plaintiffs' 93A claim based on the alleged conversion.

■ Even if the plaintiffs could point to sufficient evidence in the record to support any of their claims, Abraham and Spiliakos would still be entitled to summary judgment because of a valid release of all claims by Schmid against them, executed by Henry Sauter, with power of attorney from Schmid. F.B.A.C. is also entitled to summary judgment on the basis of this release.

■ After Ala Fadili successfully defrauded the plaintiffs and others, Abraham retained the law firm of Baker and MacKenzie in London which assisted him in attaching $1.2 million of Ala Fadili's money in Ala Fadili's bank in London on September 21, 1981. This money would have satisfied the plaintiffs' claim. Subsequently, Ala Fadili retained Edgar L. Kelley, Esq., a Massachusetts attorney, to work out a set-

tlement whereby Abraham would dissolve the attachment. To induce Abraham to free Ala Fadili's money in London, Kelley secured a release from Schmid's attorney Sauter, which by its terms releases Abraham, Spiliakos and F.B.A.C.:

> from any and all claims and demands, rights and causes of action of any kind in any jurisdiction of the United States or any foreign country and government which the undersigned (Sauter on behalf of Schmid) may now have or may ever have had against either or any of the above parties on account of or in any way growing out of contracts, transactions, promises, monies paid or obligated and any and all dealings between said First Boston Arabian Corporation, Nicholas Abraham, individually and as above described, Ala Fadili Al Tamimi and John Spiliakos, whether or not they resulted from transactions and dealings with any parties authorized to deal in their behalf or with them directly and including written agreements, proposals, letters of intent and any oral dealings, transactions and promises.

All parties in this action have stipulated that the release was duly executed by Sauter on Schmid's behalf, ratified by Schmid and may be used as if executed by Schmid himself after the contents thereof were fully explained to him. The express language of the release is plainly broad enough to encompass all of the plaintiffs' claims against these three defendants. *See Century Plastic Corp. v. Tupper Corp.*, 333 Mass. 531, 533, 131 N.E.2d 740 (1956). Any argument that this action is not within the terms of the release would violate the parol evidence rule. *Schuster v. Baskin*, 354 Mass. 137, 141, 236 N.E.2d 205 (1968).

In exchange for the release, Schmid settled for and received an unsecured promissory note, drafted by Attorney Kelley, from Ala Fadili for $100,000, a guarantee from Jurgens, and F.B.A.C.'s promise, procured by Kelly, to dissolve the attachment. Schmid and Jurgens wanted their money returned without having to go through litigation in London. Jurgens apparently trusted Ala Fadili enough to take an unse-

cured note from him in exchange for the release. Kelley's deposition reveals that Sauter was not as trusting and, therefore, would not sign a release without a guarantee from Jurgens. Unfortunately for Schmid, Sauter did not insist that either Ala Fadili's note or Jurgens' guarantee be secured. Consequently, when Abraham freed Ala Fadili's money in London and Ala Fadili and Jurgens failed to honor their promises to Schmid, Schmid was left with nothing.

■ Clearly, it was Schmid's understanding that he would give the release to Abraham, Spiliakos and F.B.A.C. only if he would get $100,000 from Ala Fadili. The release, in fact, acknowledges receipt by Sauter, on behalf of Schmid, of $100,000. Sauter simply failed to secure the $100,000 before signing the release. This failure, however, has no effect on the validity of the release given to Abraham, Spiliakos and F.B.A.C.

■ Where an action is defended on the grounds of a release admittedly executed by the plaintiff, the plaintiff has the burden of proving facts showing a right to rescind the release. *Barletta v. New York, N.H. and H.R. Co.*, 297 Mass. 275, 278, 8 N.E.2d 800 (1937). The plaintiffs allege that Abraham somehow fraudulently induced Sauter to sign the release on behalf of Schmid. The plaintiffs have pointed to no evidence in the record to support this allegation. It is uncontroverted that neither Abraham nor Spiliakos took part in drafting the release or in obtaining Sauter's signature. Ala Fadili's attorney, Edgar Kelley, initiated the settlement talks leading to the release and was solely responsible for drafting it. Abraham had no reason to seek a release at all since he had successfully attached Ala Fadili's money in London. There is no evidence that Abraham or Spiliakos had any communications whatsoever with the plaintiffs concerning the release. For these reasons, the Court rules as a matter of law that the release was not procured by the fraud of the defendants Abraham, Spiliakos or F.B.A.C..

*See Lee v. Allied Sports Associates, Inc.,* 349 Mass. 544, 551, 209 N.E.2d 329 (1965).

The release of Abraham, Spiliakos and F.B.A.C., executed by Sauter on behalf of Schmid, also entitles these defendants to summary judgment against Stahlschmidt and ATS. There is evidence in the record from which a jury reasonably could find that Schmid was acting on behalf of Stahlschmidt and ATS when he paid Ala Fadili the $100,000. However, if a jury was to find that Schmid was acting as the agent of Stahlschmidt and ATS when he paid Ala Fadili, it could not reasonably conclude that Schmid was not acting on their behalf when he authorized Sauter to sign the release.

Order accordingly.