MASS CASH REGISTER, INC., Plaintiff,

v.

COMTREX SYSTEMS CORP., Defendant.

Civ. A. No. 93–10853–PBS.

United States District Court, D. Massachusetts.

Aug. 15, 1995.

---

23. Tomczak does not allege that any other publication occurred.

Thomas J. Walsh, Robert Ciociola, Casner & Edwards, Boston, MA, for Plaintiff Mass Cash Register, Inc.

Laurence H. Reece, III, Heidlage & Reece, Boston, MA, Steven J. Fram, Archer & Greiner, Haddonfield, NJ, for Defendant Comtrex Systems Corporation.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This dispute arises out of an alleged agreement between plaintiff Mass Cash Register, Inc. (Mass Cash) and defendant Comtrex Systems Corporation (Comtrex). In its complaint, Mass Cash alleges breach of contract (Count I), tortious interference with advantageous contractual relationships (Count II), unjust enrichment (Count III), fraud (Count IV), and violation of Mass.Gen.L. ch. 93A (Count V).[1] On May 24, 1995, the Court heard oral argument on defendant Comtrex's motion for summary judgment on all counts pursuant to Fed.R.Civ.P. 56(b). For the reasons illustrated below, after hearing, the mo-

---

1. In its brief, Mass Cash also asserts its relationship with Comtrex was a partnership or joint venture. At argument, as well as in its subse- quent memoranda to the Court, however, Mass Cash represented that it is not pressing this argument.

tion for summary judgment is **ALLOWED** on all Counts except for the claim for unjust enrichment and quantum meruit.

### FACTUAL BACKGROUND

For the purposes of this motion, the undisputed facts are as follows.

1. *The Players.*

 a. *Mass Cash.*

Plaintiff Mass Cash is a Massachusetts corporation which sells, installs, and services electronic cash registers. In 1990, Mass Cash was a dealer for various companies which produced point-of-sale (POS) equipment and cash registers, including Omron, Sharp Electronics, and TEC.[2]

Since its incorporation in 1978, Thomas Speropoulos has served as the president of Mass Cash. From January 1985 until January 1991, William Mitchell was employed by Mass Cash as its sales manager and major account manager.

 b. *Comtrex.*

Defendant Comtrex is a New Jersey corporation with its principal place of business located in Moorestown, New Jersey. Formed in 1981, Comtrex originally serviced electronic cash registers but extended its business to include the manufacturing, marketing, and distribution of electronic cash registers used in the food service industry, including fast-food establishments. In 1993, Comtrex sold approximately 3500 electronic cash registers. Since February of 1989, Jeffrey Rice has been the president, chief executive officer, and a director of Comtrex.

 c. *Dunkin' Donuts.*

Although not named in the lawsuit, Dunkin' Donuts is at the vortex of this controversy. In 1990, Dunkin' Donuts had approximately 2000 to 2500 stores, including both franchised and company-owned stores. Under Dunkin' Donuts franchise agreements, the ultimate decision of whether to purchase a new POS terminal was for the franchisee to make, but franchisees could purchase only those POS terminals which Dunkin' Donuts had approved.

Davie Bent, a Dunkin' Donuts' employee since 1984 and the manager of field service systems in 1989, was in charge of personally evaluating and testing various POS terminals. Comtrex, Tranti, TEC, Fastfax, Panasonic, Sharp, and Omron were among the brands evaluated by Bent during the period pertinent to this controversy.

2. *Mass Cash's Relationship With Dunkin' Donuts.*

Beginning in 1978, Mass Cash sold cash registers and POS equipment to Dunkin' Donuts, and serviced them. For the past eleven years, Mass Cash has been the principal supplier of cash register terminals to Dunkin' Donuts, most of which are manufactured by Omron Systems Corporation (Omron), a competitor of Comtrex. Indeed, from 1985 to 1990 Omron provided about 2500 registers to Dunkin' Donuts and its franchisees. Mass Cash would buy the registers from Omron at 40–48 percent off list price and then resell them to Dunkin' Donuts at ten percent off list plus charge an installation fee.

Dunkin' Donuts was Mass Cash's largest major account in 1990. William Mitchell was the salesman for Mass Cash handling the Dunkin' Donuts account.

Beginning in 1988, Dunkin' Donuts informed Mass Cash of its need for a new POS terminal. Accordingly, Mitchell talked to various manufacturers, including Citizen, Tranti, Sanyo, Sharp, FDS, and others. Mass Cash also notified Omron of Dunkin' Donuts' request for more sophisticated POS terminals in May, 1989. Mitchell's search proceeded for two years until he found a manufacturer that offered a solution for Dunkin' Donuts. That manufacturer was Comtrex.

3. *Comtrex's Relationship With Dunkin' Donuts.*

Dunkin' Donuts' introduction to Comtrex originated in 1987, when Bent attended a

---

**2.** Mass Cash had written dealership agreements with Omron and TEC in 1990. Although no written dealership agreement existed between Mass Cash and Sharp Electronics for 1990, Mass Cash had such an agreement from 1978 to about 1986 or 1987, and again after 1990.

food service show in New York City. Thereafter, Comtrex sent Bent a proposal regarding its POS terminal for Dunkin' Donuts to review, and shipped a POS terminal which Bent spent more than one week evaluating and testing. Subsequently, Bent visited Comtrex's offices in New Jersey for two days for a demonstration of the Comtrex POS terminal.

After his visit, Bent concluded that Comtrex could not fulfill Dunkin' Donuts' need without changes on Comtrex's part. Dunkin' Donuts decided not to pursue the Comtrex POS terminals in 1988 for three reasons: (1) the price point of the basic terminal was too high; (2) the software operated under a UNIX system instead of MS–DOS, and; (3) the hardware was limited in its memory capacity.

Although Bent does not recall any further conversations with Comtrex until the meeting set up by Mass Cash in October 1990, Rice testified that he spoke with Bent in May of 1990 and provided a detailed update on the Comtrex Sprint product line. Rice also testified that he had numerous follow-up conversations with Bent from May to September 1990.

### 4. Mass Cash's Relationship With Comtrex.

In 1988, Speropoulos met with a Comtrex salesperson at Mass Cash's office to view Comtrex's product. As a result of the meeting, Speropoulos attended a Comtrex meeting at their New Jersey office that same year. Between 1988 and 1990, Speropoulos had three or four telephone conversations with Comtrex personnel regarding the possibility of selling the Comtrex product. In these discussions, no dealership agreement was reached.

#### a. Negotiations.

Sometime in the spring of 1990, Andy Fusco, a consultant for Comtrex, contacted Speropoulos to inform him that Comtrex had a new president, Jeff Rice, and that a new product was being enhanced. Comtrex had hired Fusco to review Comtrex sprint systems, and introduce it to some of the dealers. During this conversation between Fusco and Mass Cash, there was a "very light discussion" on a dealer agreement including negotiations over a geographic region. At no time during the conversation did the issue of compensation arise. Despite a discussion on the pricing of Comtrex products, no agreement was reached. Indeed, these preliminary negotiations were undertaken with an eye toward executing a written dealer agreement. Speropoulos told Fusco he would require three things to be a dealer for Comtrex: (1) exclusivity with respect to a specific geographic area encompassing Eastern Massachusetts, Eastern Connecticut, Rhode Island, and Southern New Hampshire; (2) training for Mass Cash personnel; and (3) that Comtrex upgrade its software. Fusco said that the selling price to Mass Cash would be consistent with the standard in the industry, which was approximately forty percent off price, plus or minus ten percent. Fusco also told Speropoulos that with the exception of Fall River, the desired territory would not be a problem. Despite the lack of a formalized written dealer agreement, in May, 1990, Mass Cash ordered some point of sale terminals from Comtrex, and Comtrex forwarded pricing information. Mass Cash did not reveal the opportunities presented by the Dunkin' Donuts account at this time.

Soon thereafter, in June, 1990, Fusco conducted a product demonstration at Mass Cash's office before Speropoulos, Mitchell, and other Mass Cash employees. Further discussions ensued regarding the proposed dealer agreement. Fusco also brought a written dealer agreement and dealer application with him to the meeting, and Speropoulos agreed to review it at a later date. The parties also agreed that Mass Cash would have to look at the Comtrex products further before they would formalize the agreement.

Discussions between Comtrex and Mass Cash continued through the summer of 1990. Mass Cash pursued Comtrex because Omron did not have the solution for which Dunkin' Donuts was looking, and Comtrex might satisfy Dunkin' Donuts' needs. However, Mass Cash did not yet reveal the Dunkin' Donuts' account to Comtrex.

In August 1990, Mass Cash attended another meeting at Comtrex's office in New

Jersey. There was a twofold purpose for the meeting: to find out whether Mass Cash wanted to become a dealer for Comtrex and to determine whether the Comtrex product met Dunkin' Donuts' needs. When Mass Cash realized that the Comtrex system could fulfill the needs of Dunkin' Donuts, it inquired as to Comtrex's position with respect to national accounts and dealer arrangements. Comtrex revealed that it dealt directly with Wang Laboratories, but that its focus was on dealers, not direct accounts. When Mitchell asked Rice and Fusco whether Comtrex had a major account policy, Rice said: "We work with our dealers on any large or major account that they have and support our dealers. *We don't sell them directly and cut you out.*" (Emphasis added). The answer satisfied Mitchell and Speropoulos at Mass Cash. Mitchell said: "I was comfortable after that statement that I could disclose who the account was that we had been talking about." Accordingly, Mass Cash revealed the business opportunity at its national account—Dunkin' Donuts. Mitchell then faxed Dunkin' Donuts' electronic cash register requirements to Comtrex. This information allowed Comtrex to program its product to meet Dunkin' Donuts' needs and to develop a prototype which could be presented to Dunkin' Donuts.

The next month, Mass Cash, along with other dealers, attended another meeting at Comtrex's office to view its product line. Again, negotiations on the dealer agreement continued in September and October 1990 and the parties expected to ultimately sign a written agreement, but no formal agreement was reached at this meeting: The main unresolved issue was the scope of the geographical territory of Mass Cash.

In its next communication (telephone) with Comtrex, Mass Cash expressed its desire to formalize a written agreement before it introduced Comtrex to Dunkin' Donuts. Although no agreement was forthcoming, Mass Cash nevertheless arranged an October meeting with itself, Comtrex, and Dunkin' Donuts.

### b. *The October Meeting.*

On October 2, 1990, Comtrex demonstrated its new prototype POS terminal to Dunkin' Donuts. In addition, Comtrex's role in the meeting included paying for the room, setting up the room, providing, preparing, and transporting the equipment. Mass Cash's role in the meeting comprised of introducing Comtrex to the Dunkin' Donuts account, establishing the time and date for the meeting, providing specifications, hardware, and software to Comtrex, and informing Comtrex of Dunkin' Donuts needs, plans, and growth potential. At end of meeting, Dunkin' Donuts did not approve of the Comtrex system and no agreements were reached with Dunkin' Donuts by either party.

Both prior to and after the meeting with Dunkin' Donuts, Mass Cash met privately with Comtrex to discuss the handling of the Dunkin' Donuts' account. The parties orally agreed that: (1) Comtrex and Mass Cash would jointly fulfill Dunkin' Donuts requirements, including the installation and service of the equipment; (2) Mass Cash would sell Comtrex's products directly to Dunkin' Donuts; and (3) Mass Cash would purchase the equipment at a discount from Comtrex. However, two significant issues—geographic region and the discount price offered to Mass Cash—remained unresolved. Although the parties agreed that Mass Cash would get an additional "five points" from the normal selling price, the specific discount figure off the dealer price list could not be resolved because, in part, it depended on volume. Mass Cash concedes there was no contract in October.

### c. *Comtrex Meets with Dunkin' Donuts.*

In November 1990, Comtrex met with Dunkin' Donuts without Mass Cash. This meeting was to allay Dunkin' Donuts' fears of dealing with Comtrex due to Comtrex's financial situation. As a result of this meeting, Dunkin' Donuts requested Comtrex to prepare a preliminary proposal.

In a letter dated December 5, 1990 from Rice, president of Comtrex, to James Vincenzi, Dunkin' Donuts' director of operations services and branded products, Comtrex outlined its preliminary proposal. In it, Comtrex included provisions regarding technical/product capabilities, installation/service, and pricing. The letter proposed that Mass

Cash would play a joint role with Comtrex with respect to installation, design of a maintenance plan, and warranty work. However, major issues were unresolved such as whether personnel from Mass Cash or Comtrex, or both, would have the responsibility for installation, the costs of service "which will need to be negotiated by the parties," and the nature of a maintenance plan. Comtrex sent a copy of the proposal to Mass Cash.

Mass Cash undertook no part in drafting this proposal, although it corresponds to previous discussions between Mass Cash and Comtrex. Mass Cash was unaware of the proposal until it was sent to Dunkin' Donuts on December 5, 1990. Upon reviewing the proposal, Mitchell of Mass Cash concluded that the volume discount to Dunkin' Donuts and fee were unacceptable.

### d. The December 28, 1990 Letter.

In late December 1990, Mitchell, Speropoulos, and Rice discussed the contractual issues further. Speropoulos initiated the call when he became concerned something was happening to the Dunkin' Donuts account. He anticipated a dispute with Comtrex and even the possibility of litigation over the Dunkin' Donuts account. He had called Rice numerous times, but his calls were not returned. After a lengthy telephonic discussion, Rice and Speropoulos reached agreement on certain terms. They agreed that Speropoulos would draft a letter memorializing the agreement between Comtrex and Mass Cash, and that Speropoulos would send it to Rice so that he could review it to determine whether it was satisfactory and approve it. Accordingly, Speropoulos prepared his letter of December 28, 1990, which reads, in pertinent part:

> I am reiterating my conversation with you on our agreement on this subject, the role of each party and the compensation Mass Cash Register would be receiving if the account were sold.

> Comtrex would receive 65% of list, Mass Cash Register would receive 15% of list for sales of 1–750 machines per year. That would drop to 13% for sales over 750 machines. The installing dealer or company would receive 10% of selling price.

> Comtrex would be responsible for the warranty of the hardware. Mass Cash Register and the installing dealer would have the responsibility for handling the service and shipping of any defective equipment to Comtrex for repair.

> Mass Cash Register would provide a sales rep, Bill Mitchell, to handle the following:
> —order taking from Dunkin' Donuts
> —day to day responsibility for sales and minor program changes
> —setting up the delivery and installation of equipment
> —selecting the dealer or company to handle the installation

> (Comtrex would help in the selection and have the right to override any decision in this process)

> Mass Cash Register would provide a HOTLINE to help with installations and ongoing support 16 hours a day, 7 days a week.

> Mass Cash Register would provide help to Comtrex in setting up the billing and making sure it is done right.

> Mass Cash Register would handle any test site installation and handle all installations in our own selling area.

> Comtrex would provide a person to assist Bill Mitchell with Dunkin' Donuts. Bill would handle the bulk of the responsibility in this area.

> Comtrex would directly bill the buyer for the equipment.

> Comtrex [sic] would have the responsibility for the programming of the terminal and shipping. Any program changes would be submitted to Comtrex by Mass Cash Register. After delivery, the Mass Cash Register HOTLINE would handle all program and operations questions.

> Servicing of the equipment will have to be negotiated with Dunkin' Donuts. As per our meeting with Dunkin' Donut officials at Comtrex and discussions with them on the way back from that meeting, they felt that the plan you and I had talked about would be very feasible.

> What we both felt was reasonable is that Mass Cash Register and Comtrex would share in the service income which would

probably be in the area of 10–12% of the purchase price of the equipment per year. This is tentative, realizing that Dunkin' Donuts will have the final say in the matter.

Def.Exh. 8. There was no discussion of a general dealership agreement.

The percentage of list that Mass Cash was to receive was reflected in contemporaneous notes made by Rice. Absent from the letter, however, are provisions regarding the geographic selling area for Mass Cash, which had been a bone of contention in the past, terms for servicing the equipment, the division of service income, and the duration of the agreement.

Speropoulos sent the letter to Rice "for review." No one from Comtrex ever advised Mass Cash that the letter was satisfactory. Additionally, Dunkin' Donuts never agreed to the terms of the letter.

Sometime in December 1990 or early January 1991, Comtrex sent Mass Cash another Dealer Sales Agreement, which limited Mass Cash's territory, gave Comtrex the exclusive right to pursue major accounts, set artificial sales quotas, and allowed Comtrex to terminate Mass Cash at any time. Previously, Comtrex had sent Mass Cash other Dealer Agreements, none of which were signed or returned.

On January 16, 1991, Speropoulos signed the proposed Dealer Sales Agreement, but never sent it to Comtrex. As reasons therefore, Speropoulos stated that the agreement did not include the geographical regions he desired, and "[b]ecause we had not gotten the rest of the contract settled." Under the agreement, Mass Cash's assigned territories were limited to the counties of Essex, Middlesex, Suffolk, and Norfolk in Massachusetts. Mass Cash wanted to be assigned all of eastern Massachusetts, eastern Connecticut, Rhode Island, and southern New Hampshire.

e. *Omron Enters the Picture.*

In the fall of 1990, Omron, the company which had supplied registers to Dunkin' Donuts through Mass Cash, discovered Mass Cash's involvement with Comtrex with respect to the Dunkin' Donuts account. Kraus, Omron's Regional Sales Vice President, was upset and thought that Mass Cash would have allegiance to it because Omron had introduced Mass Cash to the Dunkin' Donuts account. Kraus was "shocked when [he] found out that Mass Cash Register had gone and brought the Comtrex people in." When Omron relayed its ire to Mass Cash, Mitchell provided evidence that Mass Cash had sought Omron's assistance over a period of time and Omron had failed to respond.

In an effort to appease Omron and at Omron's request, Mitchell set up a meeting on January 7, 1991, between Omron and Dunkin' Donuts to demonstrate Omron's replacement products which could compete with Comtrex. Comtrex soon became aware of Mass Cash's continued involvement with Omron.[3]

Rice and Speropoulos discussed Mass Cash's involvement with Omron, but Rice was not satisfied that Mass Cash was merely acting out of courtesy to Omron. Comtrex contends that this was one of the reasons it ceased doing business with Mass Cash. Mass Cash asserts, however, that this reason is pretextual to justify Mass Cash's exclusion from the Dunkin' Donuts deal.

f. *The Controversy.*

In January of 1991, Comtrex and Dunkin' Donuts entered into a relationship to develop software for Dunkin' Donuts. In attempting to sever the relationship between the parties, Comtrex initially claimed that Dunkin' Donuts did not want to deal with Mass Cash because of its poor service. While Dunkin' Donuts acknowledges that there were some problems with Mass Cash, it claims it was not concerned with whether Mass Cash was involved in the transaction.

In early February, 1991, Rice proposed a more limited role for Mass Cash and offered Mass Cash two percent of retail as a commission for bringing Comtrex and Dunkin' Donuts together. Mass Cash rejected this proposal. Later that same month, Rice disa-

**3.** Contradictory testimony exists concerning whether Mass Cash informed Comtrex of the Omron–Dunkin' Donuts meeting, or whether Comtrex found out on its own.

vowed any further involvement with Mass Cash on the Dunkin' Donuts account. In a letter dated October 4, 1991, Comtrex terminated its relationship with Mass Cash.

## DISCUSSION

### 1. *Summary Judgment Standard.*

 A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). "If this is accomplished, the burden then 'shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party].' " *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir.1994), quoting *Rogers v. Fair*, 902 F.2d at 143. Mere allegations are insufficient to defeat a summary judgment motion; rather, "the nonmoving party must adduce specific, provable facts which establish that there is a triable issue." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d at 91.

 Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *Federal Deposit Ins. Corp. v. Fonseca*, 795 F.2d 1102, 1110 (1st Cir.1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.' " *Rogers, supra*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

### 2. *Breach of Contract.*

 Mass Cash contends that the letter dated December 28, 1990, is an enforceable contract. To recover damages in a breach of contract claim, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach. *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir.1995). *See also* 17 Bishop, Prima Facie Case, § 11 at 10 (M.P.S.1987) (discussing essential elements of a contract claim as: "(1) an agreement, express or implied, in writing or oral, (2) for a valid consideration, (3) performance or its equivalent by the plaintiff and breach by the defendant, and (4) damage to the plaintiff"). Whether a document constitutes a contract is a question of law. *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 406, 578 N.E.2d 789 (1991), *modified* 412 Mass. 703, 709–10, 592 N.E.2d 1289 (1992) (whether a writing constitutes a contract is a question of law where a writing is required by the Statute of Frauds); *accord Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir.1995) (applying Massachusetts law to breach of contract claim). Where it is mutually understood that a promise is not legally binding, but rather intended to express a present intention, it is not a contract. *Rhode Island Hospital Trust National Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).

 When "parties contemplate the execution of a final written agreement," a strong inference is made that they "do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 216, 195 N.E. 323 (1935). *Accord Goren v. Royal Investments Inc.*, 25 Mass. App.Ct. 137, 140–41, 516 N.E.2d 173 (1987), *rev. denied*, 401 Mass. 1104, 519 N.E.2d 595 (1987), *further app. rev. denied*, Jan. 25, 1988; *Tull v. Mister Donut Development Corp.*, 7 Mass.App.Ct. 626, 630, 389 N.E.2d 447 (1979).

### (1) *The Standard Dealer Sales Agreement.*

 As Mass Cash concedes, the dealer sales agreement did not constitute an enforceable contract between the parties. It is undisputed that Comtrex sent Mass Cash various dealer sales agreements, none of which were signed by Mass Cash until Janu-

ary 16, 1991. The agreement itself indicates that it is not effective until "it has been accepted and executed by COMTREX at its offices in Moorestown, New Jersey," and Speropoulos admits that he never sent the agreement to Comtrex. Accordingly, the dealer agreement is unenforceable as it was neither delivered in accordance with its terms or as required by law. *See Laprade v. Fitchburg & L. St. Ry. Co.*, 205 Mass. 77, 79, 90 N.E. 982 (1910) (for a written agreement to bind the party whom executes it, the agreement must be delivered). However, plaintiff correctly points out that the parties were negotiating an agreement for the Dunkin' Donuts account separate from the issue of Mass Cash becoming Comtrex's New England dealer.

### (2) *The December 28, 1990 Letter.*
#### (a) *Mutual Assent.*

Mass Cash also argues that the letter of December 28, 1990, constitutes the contract between the parties. The question here is whether there was mutual assent.

> Parties do not become contractually bound until they mutually assent to bind themselves to an agreement. Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do.... Parties can agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate.

*Salem Laundry Co. v. New England Teamsters and Trucking Ind. Pension Fund*, 829 F.2d 278, 280 (1st Cir.1987).

In *Novel Iron Works, Inc. v. Wexler Const. Co., Inc.*, 26 Mass.App.Ct. 401, 407–08, 528 N.E.2d 142, *rev. denied*, 403 Mass. 1104, 530 N.E.2d 797 (1988), the Massachusetts Appeals Court held:

> The legal principles which are to be applied in resolving the issue are well established. While, as here, parties negotiate orally as to the terms of an agreement while intending to execute a written contract, *the parties generally are not bound until the contract is signed.* If, however, the parties orally agree to the essential terms of the transaction, it may be in-

ferred that they intended to bind themselves at that time and that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the clearly mutual assent of the parties to those terms. Further, where the facts show that the parties intended to be bound at some point in their negotiations before execution of a formal contract, they will not be bound unless there is agreement as to the basic terms of the undertaking. There must be agreement on the essential terms of the transaction in order that the nature and extent of the parties' obligations can be determined, and hence, enforced.

*Id.* (Emphasis added) (internal citations omitted).

▇▇▇ "[L]anguage looking to execution of a final written contract justifies a *strong inference* that significant items on the agenda of the transaction are still open, and hence, that the parties do not intend to be bound." *Goren v. Royal Investments, Inc.*, 25 Mass.App.Ct. 137, 140, 516 N.E.2d 173, *rev. denied*, 401 Mass. 1104, 519 N.E.2d 595 (1988) (emphasis added) (citation omitted).

▇▇▇ A contract based on the December 28, 1990 letter hinged upon review and approval by Rice. Rice's failure to assent to the writing is fatal. *See Laprade v. Fitchburg & L. St. Ry. Co.*, 205 Mass. at 79, 90 N.E. 982 (a written agreement is ineffective if it remains unaccepted by the other party). "Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements." *Tull v. Mister Donut Development Corp.*, 7 Mass.App.Ct. at 631, 389 N.E.2d 447.

▇▇▇ Plaintiff argues that the parties bound themselves irrevocably to a contract during their telephone conversation in December 1990. Here, even drawing all experiences in favor of Mass Cash, there was no mutual assent to all the essential terms. According to Speropoulos, Rice had been so elusive that Speropoulos even contemplated litigation. During the one hour telephone conversation, there had continued to be disagreements over significant items, like geo-

graphic region for the Dunkin' Donuts account. Under their past dealings, there had been continued disagreement over the terms of the standard dealer account which Mass Cash repeatedly refused to sign. With respect to the Dunkin' Donuts account, plaintiff concedes that both parties contemplated executing a written contract. Because the letter recognizes that the agreement was "tentative" as it would depend on approval of Dunkin' Donuts, the relationship between the parties was troubled, and unresolved significant contractual terms persisted, the court concludes that even drawing all inferences in favor of the non-moving party, there was no mutual assent to the essential terms of an agreement.

### (b) *Concrete and Definite.*

■ The alleged agreement between the parties is unenforceable due to its indefiniteness. It is axiomatic that a contract's essential terms must be "sufficiently definite so that the nature and extent of the obligations of the parties" are ascertainable. *Simons v. American Dry Ginger Ale Co.,* 335 Mass. 521, 523, 140 N.E.2d 649 (1957); *see also Caggiano v. Marchegiano,* 327 Mass. 574, 580, 99 N.E.2d 861 (1951) ("an agreement to enter into a contract which leaves the terms of that contract for future negotiation is too indefinite to be enforced"). *Accord Bell v. B.F. Goodrich Co.,* 359 Mass. 763, 270 N.E.2d 926 (1971); *George W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. 383, 390, 186 N.E. 562 (1933). Indeed,

> '[i]t is essential to the existence of a contract that its nature and the extent of its obligations be certain.' It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking, although a contract is not necessarily unenforceable because the parties agree that the details for certain of its terms shall be left to be fixed at a future time or by the happening of later events.

*George W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. at 390, 186 N.E. 562 (internal citations omitted).

■ While courts are powerless to write an entire contract, *L.R.J. Ryan v. Wer-*

*si Electronics GmbH and Co.,* 3 F.3d 174, 181 (7th Cir.1993), if its meaning can be discerned with reasonable certainty in light of the attending circumstances, the court will enforce it. *Simons v. American Dry Ginger Ale Co.,* 335 Mass. at 523, 140 N.E.2d 649; *see also Caggiano v. Marchegiano,* 327 Mass. at 579, 99 N.E.2d 861 (unexpressed terms may become part of a contract by custom or usage so long as they are both universal and uniform). This is so even where the agreement fails to specify a durational term. In such circumstances, the contract will be construed as one " 'terminable at will by either party upon reasonable notice.' " *Simons v. American Dry Ginger Ale Co.,* 335 Mass. at 524, 140 N.E.2d 649.

■ This is not a case where all material terms were agreed upon so that the written agreement merely memorialized a contract previously made final by an earlier mutual assent. *See Rosenfield v. United States Trust Co.,* 290 Mass. at 216, 195 N.E. 323. Contrary to Mass Cash's assertion that "[t]he terms of the agreement between the parties were fixed," the geographic region, which had always been the sticking point between the parties, remained unresolved. Also, the letter itself points out that the servicing of the equipment would have to be negotiated, and does not resolve how Mass Cash and Comtrex would share in the service income. *Compare Goren v. Royal Investments Inc.,* 25 Mass.App.Ct. at 141, 516 N.E.2d 173 (execution of contract held merely a formality where all significant issues were settled in the preliminary agreement) and *Novel Iron Works, Inc. v. Wexler Construction Co., Inc.,* 26 Mass.App.Ct. 401, 408–10, 528 N.E.2d 142 (oral agreement enforced where preliminary negotiation were complete, all essential terms agreed upon, and parties acted in accordance with the agreement), *rev. denied,* 403 Mass. 1104, 530 N.E.2d 797 (1988) *with Tull v. Mister Donut Development Corp.,* 7 Mass.App.Ct. at 630, 389 N.E.2d 447 (negotiation were inchoate despite written summary of the proposed transaction) and *George W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. at 390, 186 N.E. 562 (no enforceable

contract shown where many of the essential terms were omitted).

The Uniform Commercial Code (UCC) permits a court to consider the circumstances and background between the parties, and their course of dealing to the extent that such evidence explains or supplements existing contractual terms. *See* M.G.L. ch. 106, § 2–202; *ITT Corp. v. LTX Corp.*, 732 F.Supp. 1225, 1236 (D.Mass.1990), *rev'd on other gds*, 926 F.2d 1258 (1st Cir.1991). Here, however, there exists a paucity of evidence concerning a course of dealing which would supply these material terms. *Compare Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth.*, 7 Mass.App.Ct. 336, 342, 387 N.E.2d 206 (1979) (where contract existed, missing essential term may be supplied by court).

Accordingly, the parties failure to agree on material terms militates against the finding of a contract. *See Rosenfield v. United States Trust Co.*, 290 Mass. at 216, 195 N.E. 323 (failure of the parties to agree to material terms may preclude rights and obligations from arising because of the lack of a completed contract); *Held v. Zamparelli*, 13 Mass. App.Ct. 957, 958–59, 431 N.E.2d 961 (1982) (oral agreement held unenforceable due to lack of essential terms).

#### (c) *Statute of Frauds.*

▮ Comtrex asserts that if the Court finds an oral distributorship agreement between the parties with respect to the Dunkin' Donuts account, it is unenforceable as it runs afoul of the Statute of Frauds. *See Def.Br.* at 21. To be enforceable, an agreement need not be reduced to writing unless required by the Statute of Frauds. *ESO, Inc. v. Kasparian*, 32 Mass.App.Ct. 731, 733–34, 594 N.E.2d 557 (1992) (no dispute that the parties agreed on price, but never put it in writing); *Lampasona v. Capriotti*, 296 Mass. 34, 37–39, 4 N.E.2d 621 (1936) (contract may be valid even though it is partly oral and partly written if it does not fall within the Statute of Frauds).

Under Massachusetts law,

a contract for the sale of goods for the price of five hundred dollars or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

M.G.L. ch. 106, § 2–201(1).

As a threshold matter, the Court must first determine whether there was an oral agreement on the essential terms of a contract regarding the Dunkin' Donuts account. For the reasons stated above with respect to the December 28 letter, which Speropoulos states reflects the oral discussion, the Court concludes there was no meeting of the minds during the telephonic discussion on all the essential terms.

However, even if there were an oral agreement, the statute of frauds would bar its enforcement. The majority have held that Section 2–201(1) applies to distributorship agreements. *Compare L.R.J. Ryan v. Wersi Electronics GmbH and Co.*, 3 F.3d 174 (7th Cir.1993) and *Bausch & Lomb Inc. v. Sonomed Technology, Inc.*, 780 F.Supp. 943 (E.D.N.Y.1992), *aff'd in part and vacated in part sub nom. Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720 (2d Cir.1992) and *United Wholesale Liquor Co. v. Brown–Forman Distillers Corp.*, 108 N.M. 467, 470, 775 P.2d 233, 236 (1989) (finding Statute of Frauds applies to distributorship agreement) *with Maine Surgical Supply Co. v. Intermedics Orthopedics, Inc.*, 756 F.Supp. 597, 601–02 (D.Me.1991) (summary judgment precluded where genuine issue of fact existed as to whether distributorship contract was a sale of goods or of services). *See also Paulson, Inc. v. Bromar, Inc.*, 775 F.Supp. 1329, 1333 (D.Haw.1991) (noting precedent for applying UCC to distributorship agreements).

▮ Article two does not apply to the rendition of services. *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1266 (1st Cir.1991). Under Massachusetts law, the test for determining whether a hybrid contract for both goods and services falls within the purview of the U.C.C. "is whether the predominant factor, thrust, or purpose of the contract (1) the rendition of service, with goods incidentally involved, ... or is [instead (2) ] a transaction

of sale, with labor incidentally involved." *Id.* (internal citations and quotations omitted).

■ Here, the parties vacillated in their negotiations over whether Mass Cash or Comtrex would sell the cash registers to Dunkin' Donuts. As the parties left open the question of which company would be responsible for servicing, and provided that both companies would share in the profits from the sales, the Court concludes that the primary thrust of any oral agreement was the sale of cash registers. Neither party argues that the alleged contract is outside the scope of article two. Accordingly, the article two's Statute of Frauds, M.G.L. ch. 106, § 2–201(1), is applicable to the instant case.

In support of its contention that the Statute of Frauds is inapplicable to the present controversy, Mass Cash advances the following: (1) the written confirmation exception; (2) partial performance by Mass Cash removes the requirement of the Statute of Frauds; and (3) promissory estoppel vitiates the Statute of Frauds defense.[4] The Court addresses these arguments *in seriatim.*

1. *The Written Confirmation Exception.*

■ First, under the written confirmation exception, "failure to answer a written confirmation of a contract within ten days of receipt ... is sufficient against both parties under subsection (1)." Mass.Gen.L. ch. 106, § 2–201, UCC Comment, Comment 3. Mass Cash argues that Comtrex's failure to respond to its December 28, 1990, falls within the exception's purview. In opposition, Comtrex asseverates that because both parties understood the December 28, 1990 letter as requiring Comtrex's approval and does not contain a quantity term, the exception is inapplicable. Comtrex's position is persuasive.

■ To satisfy the written confirmation exception, the writing must: (1) evidence a contract for the sale of goods, (2) be 'signed' by the party to be charged; and (3) contain a quantity term. M.G.L. ch. 106, § 2–201, UCC Comment, Comment 1. *See Columbus*

*Trade Exchange, Inc. v. AMCA Internat'l Corp.,* 763 F.Supp. 946, 950 (S.D.Ohio 1991) (writing did not satisfy written confirmation exception because lacked quantity term); *Rockland Industries, Inc. v. Frank Kasmir Associates,* 470 F.Supp. 1176, 1178–79 (N.D.Texas 1979) (while the exception provides a basis for believing that a real transaction supports the oral evidence, the written confirmation must contain a quantity term).

■ Here, although it specifies a percentage of list price to be paid to Mass Cash for the first 750 cash registers, and a lesser percentage for all cash registers over 750, the letter is devoid of any specific quantity term. Rather the letter contemplates the sale of an indefinite number of cash registers. Therefore, even as a written confirmation, the letter fails to meet the requirements of the UCC. Finally, the undisputed facts evince that both parties agreed that Comtrex's approval was required. The agreement was not signed by the party to be charged. Accordingly, the written confirmation exception provides no relief for Mass Cash.

2. *Partial Performance.*

■ Second, Mass Cash asserts, without explanation, that its performance removes the case from the Statute of Frauds. Mass Cash's performance consisted of its prior action introducing Comtrex to the Dunkin' Donuts account and providing the necessary specifications for Comtrex to pursue this business opportunity. Mass Cash engaged in these activities *prior* to the December 28, 1990 letter, when negotiations were still underway. Accordingly, Mass Cash's activities prior to the alleged oral agreement fail to bring it within the partial performance rule.

3. *Promissory Estoppel.*

■ Finally, Mass Cash relies on the doctrine of promissory estoppel to vitiate the Statute of Frauds defense. The Court notes that under Massachusetts law, the doctrine

---

4. In its initial brief, Mass Cash also asserted that the transaction was a partnership or joint venture, not a contract for the sale of goods. However, in subsequent memoranda to the Court, as well as in oral argument, the plaintiffs do not pursue this theory. Based on these representations, the Court will not entertain the argument.

of promissory estoppel may preclude the use of the Statute of Frauds in defense. *See Goeken v. Kay,* 751 F.2d 469, 474 (1st Cir. 1985) (estoppel exception to statute of frauds did not apply where court found reliance was unreasonable); *Frederick v. ConAgra, Inc.,* 713 F.Supp. 41, 45 (D.Mass.1989); *Hoffman v. Optima Systems, Inc.,* 683 F.Supp. 865, 869 (D.Mass.1988) (discussing interplay of statute of frauds and promissory estoppel).

In order for promissory estoppel to apply, however, three elements must be present:

> (1) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) Detriment to such person as a consequence of the act or omission.

*Cellucci v. Sun Oil Co.,* 2 Mass.App.Ct. 722, 728, 320 N.E.2d 919 (1974), *aff'd,* 368 Mass. 811, 331 N.E.2d 813 (1975). *Accord Frederick v. ConAgra, Inc.,* 713 F.Supp. at 45. " 'An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation.' " *Rhode Island Hospital Trust National Bank v. Varadian,* 419 Mass. at 848, 647 N.E.2d 1174, quoting, *Pappas Industrial Parks, Inc. v. Psarros,* 24 Mass. App.Ct. 596, 599, 511 N.E.2d 621, *rev'd denied,* 400 Mass. 1107, 513 N.E.2d 1289 (1987).

Here, Mass Cash claims that the unambiguous promise was Comtrex's assurance that it would not cut Mass Cash out of the picture and deal directly with Dunkin' Donuts. When Mass Cash realized that Comtrex could meet the needs of Dunkin' Donuts, it asked what Comtrex's position was with respect to national accounts. Although Comtrex was upfront with Mass Cash that it dealt directly with another national account,

Wang Laboratories, it stated that it tried to access dealers not major accounts, and would not cut out its major dealer. Mitchell then presented the Dunkin' Donuts account because he felt "comfortable". Mass Cash has presented specific facts to support a claim that Comtrex made a representation intended to induce Mass Cash to disclose a national account, and that Mass Cash relied on that statement in disclosing the identity of the Dunkin' Donuts account. *See John Alden Transp. Co., Inc. v. Bloom,* 11 Mass.App.Ct. 920, 921, 415 N.E.2d 250 (1981) (to avoid summary judgment, plaintiff must set forth "specific facts which contradict" defendant's submissions).

The problem is that Mass Cash must demonstrate that it relied on the representation *to its detriment.* Mass Cash argues that because it presented the opportunity, provided the data necessary for Comtrex to redesign its system, and arranged for a meeting with the senior Dunkin' Donuts personnel, it is entitled to the benefit of the bargain for the products sold to Dunkin' Donuts. However, because it is undisputed that Mass Cash had been looking for two years to find another manufacturer with an adequate product to no avail, it cannot be argued that its reliance on the representation resulted in lost profits. However, Mass Cash has argued that it relied to its detriment by losing its prior business as a dealer to Omron. That would be sufficient to support a promissory estoppel claim. However, there is no evidence in the record to support the claim.

The December 5 and December 28, 1990 letters cannot be enforced under a promissory estoppel theory as Mass Cash has not relied on the alleged promises contained therein to its detriment. *See Cellucci v. Sun Oil Co.,* 2 Mass.App.Ct. at 728, 320 N.E.2d 919 (discussing elements of promissory estoppel). Under these circumstances, promissory estoppel does not bar Comtrex's Statute of Frauds defense.[5]

---

5. Because this court concludes there is no enforceable contract, the court need not determine if it is terminable at will. When no definite term is set forth in a contract, the contract is terminable at will. *Maddaloni v. Western Mass. Bus Lines, Inc.,* 386 Mass. 877, 879, 438 N.E.2d 351 (1982); *Simons v. American Dry Ginger Ale Co.,*

335 Mass. at 524–25, 140 N.E.2d 649; *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Auth.,* 15 Mass.App.Ct. 992, 994, 448 N.E.2d 70 (1983) and cases cited.

Mass Cash does not dispute the lack of durational term in the contract, but it seeks to fit its

### 3. *Tortious Interference with Advantageous Contractual Relationships.*

Comtrex also moves for summary judgment on Mass Cash's claim of tortious interference with advantageous contractual relationships (Count III). Mass Cash argues that Comtrex interfered with its longstanding relationship with Dunkin' Donuts and engaged in improper conduct in seeking to cut Mass Cash out of the deal with Dunkin' Donuts. In support of its position, Mass Cash claims the following: (1) Comtrex lied to Mass Cash claiming that Dunkin' Donuts personnel did not want Mass Cash involved in the deal; (2) Comtrex sought assurances from Dunkin' Donuts that excluding Mass Cash would not jeopardize Comtrex's future sales to Dunkin' Donuts; and (3) "an inference can be drawn that Comtrex also lied to Dunkin' Donuts regarding its reason for excluding Mass Cash." Pl.Brief at 26. The Court finds these arguments unpersuasive.

 In a claim of unlawful interference with contractual relations, the plaintiff must prove that he had a contract with a third party and that the defendant "knowingly induced the third party to break that contract." *Draghetti v. Chmielewski*, 416 Mass. 808, 816, 626 N.E.2d 862 (1994); *accord Evans v. Certified Eng'g & Testing Co., Inc.*, 834 F.Supp. 488, 498 (D.Mass.1993). Additionally, the defendant's conduct must be not only intentional, but "improper in motive or means, causing harm to the plaintiff." *Draghetti v. Chmielewski*, 416 Mass. at

816, 626 N.E.2d 862; *accord Evans v. Certified Eng'g & Testing Co., Inc.*, 834 F.Supp. at 498.

 In the instant case, however, it is beyond dispute that no contract existed between Dunkin' Donuts and Mass Cash to which Comtrex interfered. Although the complaint alleges that Comtrex interfered with Mass Cash's contractual relations with Dunkin' Donuts and its franchisees, Mass Cash does not offer any evidence of a contract between Dunkin' Donuts and itself. Mass Cash admits as much in its brief, stating that the Comtrex interfered in the longstanding relationship between the parties, but failing to identify the contract to which Comtrex interfered.

 A claim of intentional interference with advantageous business relations requires proof of four elements: (1) the existence of a business relationship or contemplated contract of economic benefit; (2) defendant's knowledge of such relationship; (3) the defendant's intentional and improper interference with that relationship; and (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 814–16, 551 N.E.2d 20 (1990), modifying *ELM Medical Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 532 N.E.2d 675 (1989) (requiring malice); *see also Evans v. Certified Eng'g & Testing Co.*, 834 F.Supp. at 498.

contract into the category of cases which hold that where a contract contemplates the achievement of a definite end, but is silent as to its duration, a reasonable time is implied based on all relevant evidence. *See, e.g., Thermo Electron Corp. v. Schiavone Construction Co.*, 958 F.2d 1158, 1164 (1st Cir.1992) (holding contract to sell a project which contained no time limits was to be performed within a reasonable time as determined by the court based on all the evidence); *Bushkin Assoc., Inc. v. Raytheon Co.*, 815 F.2d 142, 146 (1st Cir.1987) (reasonable time implied in contract involving merger of corporations); *Alexander v. Berman*, 29 Mass.App.Ct. 458, 460–61, 560 N.E.2d 1295 (1990) (imposing a reasonable time in a nonexclusive brokerage agreement to sell a business held proper). *Plymouth Port, Inc. v. Smith*, 26 Mass.App.Ct. 572, 576–77, 530 N.E.2d 194 (contrasting an alleged

exclusive agency agreement for the sale of property for which the law will imply a reasonable time with general at-will employment contracts) (citations omitted), *rev. denied*, 403 Mass 1106, 532 N.E.2d 690 (1988); *L.R.J. Ryan v. Wersi Electronics GmbH and Co.*, 3 F.3d at 181 (under Illinois law, executory distributorship contract which lacks durational period is terminable at will).

This dispute buttresses the court's earlier conclusion that there was a lack of agreement on essential terms. Comtrex's standard agreement is terminable on thirty days notice. Even if Mass Cash could argue that there was a specific agreement on at least the first 750 registers, there was no agreement on the servicing. However, this dispute may well be relevant with respect to the remedies available under the claim of unjust enrichment and quantum meruit.

Interference itself is not enough to support liability unless the interference is "wrongful by some measure." *Schinkel v. Maxi–Holding, Inc.,* 30 Mass.App.Ct. 41, 50–1, 565 N.E.2d 1219, *rev. denied,* 409 Mass. 1104, 569 N.E.2d 832 (1991). In defining improper, the Supreme Judicial Court opined that:

> [the] [d]efendant's liability may arise from improper motives or from the use of improper means.... No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant.

*United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 816, 551 N.E.2d 20 (1990); *accord Schinkel v. Maxi–Holding, Inc.,* 30 Mass.App.Ct. at 51, 565 N.E.2d 1219 (1991). Thus, it is essential that the defendants acted without lawful cause. *Conway v. Smerling,* 37 Mass.App.Ct. 1, 7, 635 N.E.2d 268 (1994); *see also Riseman v. Orion Research Incorp.,* 394 Mass. 311, 314, 475 N.E.2d 398 (1985) ("A claim for interference with an advantageous business relationship involves one who, without privilege to do so, intentionally induces or causes a third person not to enter into or continue a business relationship with another.").

In the context of the present controversy, Mass Cash's claim for interference with advantageous business relationships is likewise without merit.[6] First, Mass Cash fails to direct the Court to any improper interference on the part of Comtrex. The fact that Comtrex initially lied to Mass Cash regarding the reasons for its exclusion from the contract does not support such a claim. *See Riseman v. Orion Research Incorp.,* 394 Mass. at 314, 475 N.E.2d 398 (one cannot be held liable for tortious interference with its own relationship with another); *accord Mailhiot v. Liberty Bank and Trust Co.,* 24 Mass.App.Ct. 525, 528, 510 N.E.2d 773 (1987); *Evans v. Certified Eng'g & Testing Co., Inc.,* 834 F.Supp. at 498. Additionally, Mass Cash asks the Court to infer that Com-

trex, in an effort to oust Mass Cash from the deal, lied to Dunkin' Donuts about Mass Cash. A mere allegation will not defeat a motion for summary judgment. *See Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d at 91 (mere allegations are not sufficient to defeat motion for summary judgment). There is no evidence on point.

Second, Mass Cash has failed to identify, aside from the contract between the parties, what damage it has suffered as a result of Comtrex's conduct. *See Morochnick v. Quigley,* 17 Mass.App.Ct. 1035, 1035–36, 461 N.E.2d 1220 (actual damage is required to sustain a claim for intentional interference with an advantageous business relationship), *rev. denied,* 392 Mass. 1102, 465 N.E.2d 261 (1984). Defendants correctly assert that no evidence indicates that Mass Cash's Omron sales to Dunkin' Donuts have been affected by Comtrex's conduct. Indeed, it appears that Omron could not meet Dunkin' Donuts' needs, which was the very reason Mass Cash turned to Comtrex.

Third, any assurance Comtrex sought from Dunkin' Donuts that Mass Cash's exclusion would not jeopardize Comtrex's position is not improper. Merely furthering one's interest as a competitor does not rise to the level of tortious activity absent improper conduct. *See Beekman v. Marsters,* 195 Mass. 205, 212, 80 N.E. 817 (1907); *see also King v. Driscoll,* 418 Mass. 576, 587, 638 N.E.2d 488 (1994) ("motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement").

### 4. *Unjust Enrichment.*

Mass Cash asserted the equitable claim of unjust enrichment in its complaint (Count III) and seeks the creation of a constructive trust "as to the profits to be made by Comtrex on its sale of goods to Dunkin' Donuts." (¶ 41). It claims it lacks an adequate remedy at law.

A court in equity generally may impose a constructive trust "in order to avoid the unjust enrichment of one party at the

---

**6.** Although not pleaded in its complaint, Mass Cash advances an argument under this cause of

action in its brief.

expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation." *Nessralla v. Peck,* 403 Mass. 757, 762, 532 N.E.2d 685 (1989), citing *Barry v. Covich,* 332 Mass. 338, 342, 124 N.E.2d 921 (1955). *See also Fortin v. Roman Catholic Bishop of Worcester,* 416 Mass. 781, 789, 625 N.E.2d 1352 (1994) ("A court will declare a party a constructive trustee of property for the benefit of another if he acquired the property through fraud, mistake, breach of duty, or in other circumstances indicating that he would be unjustly enriched"). A constructive trust is also imposed to avoid the unjust enrichment of one party at the expense of the other where "information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information." *John Alden Transportation Co., Inc. v. Arnold Bloom,* 11 Mass.App.Ct. 920, 921, 415 N.E.2d 250 (1981), citing *Barry v. Covich,* 332 Mass. at 342, 124 N.E.2d 921.

■ Plaintiff has presented no evidence of fraud, mistake, breach of fiduciary duty or breach of contractual duty. However, it has presented evidence that it gave Comtrex confidential business information about the Dunkin' Donuts account which Comtrex used to its advantage and to the disadvantage of Mass Cash. Although Comtrex claims that it knew about the Dunkin' Donuts' business opportunity long before it was even disclosed by Comtrex, this is a disputed issue of material fact. Comtrex also claims that Mass Cash is not entitled to equitable relief because it breached a duty to it by representing Omron as a dealer. This, too, is an issue of fact. Accordingly, the Court **DENIES** the motion to dismiss on this Count.

### 5. *Quantum Meruit*

Mass Cash also argues that summary judgment is inappropriate as a jury could find a contract implied in fact and law or a quasi contract. *See LiDonni, Inc. v. Hart,* 355 Mass. 580, 583, 246 N.E.2d 446 (1969) (implied in fact contract may be established by the conduct and relations of the parties); *Monaco v. Lombard Bros., Inc.,* 24 Mass. App.Ct. 941, 942, 509 N.E.2d 28 (1987) ("contract may be 'inferred from the conduct of the parties and from the attendant circumstances'"). The claim of quantum meruit was not in the complaint. However, plaintiff seeks the remedy in the alternative if this Court finds no contract.

■ Under Massachusetts law, an implied contract claim requires: (1) a measurable benefit conferred by Mass Cash upon Comtrex; (2) a reasonable person in Comtrex's position would have expected to pay for the services accepted; and (3) Mass Cash furnished the services with the reasonable expectation of securing compensation from Comtrex. *Bolen v. Paragon Plastics, Inc.,* 747 F.Supp. 103, 106–07 (D.Mass.1990). Similarly, quantum meruit permits the recovery in law for the fair value of services in the absence of a contract. *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth.,* 7 Mass.App.Ct. at 341, 387 N.E.2d 206 (generally, parties may invoke the remedy of quantum meruit, that is, asking recovery for the fair value of services and materials, in the absence of a contract).

■ The law creates an obligation under a quasi or implied contract theory "for the reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.... '[C]onsiderations of equity and morality play a large part ... in constructing a quasi contract....'" *Salamon v. Terra,* 394 Mass. 857, 859, 477 N.E.2d 1029 (1985) (citations omitted).

The Supreme Judicial Court explained:

"It is not really a contract, but a legal obligation closely akin to a duty to make restitution" (citation omitted). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1 (1937). The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other.

*Id.* at 859, 477 N.E.2d 1029.

■ Where, as here, an unenforceable contract is found, Massachusetts courts permit quantum meruit recovery on the theory of unjust enrichment. *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 793–94, 494

N.E.2d 374 (1986). *Accord Salamon v. Terra*, 394 Mass. at 859, 477 N.E.2d 1029 (courts will imply a contract to avoid unjust enrichment); *Schmid v. National Bank of Greece, S.A.*, 622 F.Supp. 704, 713 (D.Mass.1985), *aff'd* 802 F.2d 439 (1st Cir.1986).

> Where services are rendered by one party and voluntarily accepted by another, the presumption that there is an expectation of payment therefor, as well as an implied promise of payment for the reasonable worth of those services, may be rebutted by a showing of a strong self-interest in the outcome of the transaction by the party furnishing those services. Compensation on a quasi contract theory is not mandated where the services were rendered simply to gain a business advantage or where the plaintiff did not contemplate a personal fee. "[C]hagrin, disappointment, vexation, or supposed ingratitude cannot be used as a subsequent basis for a claim of compensation where none was originally intended or expected."

*Salamon v. Terra*, 394 Mass. at 861–62, 477 N.E.2d 1029 (internal citations omitted); *see also Holmes v. Torguson*, 41 F.3d 1251, 1256 (8th Cir.1994) (under Minnesota law, denying recovery based on theory of unjust enrichment where plaintiff expended time and money without a written contract where such "expenditures were made primarily for his own benefit"). No implied contract will be found in the absence of a benefit conferred. *Schmid v. National Bank of Greece, S.A.*, 622 F.Supp. at 713; *Dines v. Liberty Mutual Ins. Co.*, 28 Mass.App.Ct. 195, 198, 548 N.E.2d 1268 (quantum meruit available where one party is unjustly enriched and the other party suffers an unjust detriment), *rev. denied*, 406 Mass. 1105, 551 N.E.2d 536 (1990).

■ The existence of an implied in fact contract is a factual question for the jury. *See Bushkin Assoc., Inc. v. Raytheon Co.*, 815 F.2d 142, 150 (1st Cir.1987) (jury could reasonably find implied in fact contract). Mass Cash has demonstrated facts sufficient to support such a claim. *Paper*

*Corp. of United States v. Schoeller Technical Papers, Inc.*, 773 F.Supp. 632, 641 (S.D.N.Y. 1991). Here, drawing all inferences in favor of plaintiff, the court concludes there is sufficient evidence to go to a jury on whether there was reasonable expectation of compensation from Comtrex for the benefit of having Mass Cash introduce it to Dunkin' Donuts. Mass Cash facilitated the relationship between its long standing major account, Dunkin' Donuts and Comtrex, which had tried repeatedly in vain to gain access to that account. The Court relies on the undisputed fact that even after the negotiations fell apart, Comtrex offered a fee to Mass Cash for its services—strong evidence it expected to pay some compensation. Accordingly, the court **DENIES** the defendant's motion on the claim for the remedy of quantum meruit.[7]

### 6. *Fraud.*

In its complaint, Mass Cash claims that Comtrex made two fraudulent representations: that the two would pursue the Dunkin' Donuts account jointly and that Dunkin' Donuts had urged Mass Cash's exclusion. Comtrex also moves for summary judgment on this count.

■ An action for fraud will lie under Massachusetts law where a defendant makes "a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiffs to act thereon, and that the plaintiffs relied upon the representation as true and acted upon it to their damage." *Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 357 Mass. 40, 44, 255 N.E.2d 793 (1970) (adopting Restatement, Torts, sec. 525); *International Totalizing Systems, Inc. v. PepsiCo, Inc.*, 29 Mass. App.Ct. 424, 431, 560 N.E.2d 749, *rev. denied*, 408 Mass. 1105, 563 N.E.2d 692 (1990); *Schmid v. National Bank of Greece, S.A.*, 622 F.Supp. 704, 711 (D.Mass.1985), *aff'd*, 802 F.2d 439 (1st Cir.1986).

■ Fraudulent intent may be proved by "a statement made as of the party's own knowledge, which is false; provided the thing

---

7. Mass Cash should be warned, however, that it is not entitled to the benefit of the bargain, but only reasonable compensation.

stated in not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge." *Harris v. Delco Products, Inc.,* 305 Mass. 362, 364, 25 N.E.2d 740 (1940). Generally, "false statements of belief, of conditions to exist in the future, or of matters promissory in nature are not actionable." *Yerid v. Mason,* 341 Mass. 527, 530, 170 N.E.2d 718 (1960); *accord Saxon Theatre Corp. v. Sage,* 347 Mass. 662, 667, 200 N.E.2d 241 (1964); *Harris v. Delco Products, Inc.,* 305 Mass. at 365, 25 N.E.2d 740.

▮▮▮▮ In the case at bar, there is no evidence that Comtrex's statement that it would jointly pursue the Dunkin' Donuts account with Mass Cash and would not cut out Mass Cash was fraudulent. Mass Cash invites the Court to draw the inference that Comtrex intended to freeze it out of the deal with Dunkin' Donuts from the outset based on Comtrex's later false assertion that Dunkin' Donuts did not want Mass Cash involved. However, the overwhelming evidence indicates that the parties were attempting to hammer out the essential terms of the Dunkin' Donuts venture. Comtrex kept sending written dealership agreements to Speropoulos, which he refused to sign. Indeed, on December 5, 1990, Comtrex still considered its deal with Dunkin' Donuts a joint effort as evidenced by its letter to Dunkin' Donuts which it forthrightly "cc'ed" to Mass Cash. To infer that deceit is at work any time contractual negotiations sour is untenable. *See Saxon Theatre Corp. v. Sage,* 347 Mass. 662, 667, 200 N.E.2d 241 (1964) (plaintiff's reliance on representation of intent to draw up and execute a mutually acceptable lease where essential terms were still undecided held unreasonable); *Chedd–Angier Production Co. v. Omni Publications Internat'l, Ltd.,* 756 F.2d 930, 939 (1st Cir. 1985) (no fraud where parties had agreed to enter into a contract but settlement of contract terms were unresolved and no contract was consummated). "Until all essential terms are settled, it cannot reasonably be said that there is a meaningful intention which can be misrepresented." *Saxon Theatre Corp. v. Sage,* 347 Mass. at 668, 200 N.E.2d 241.

▮▮▮▮ Additionally, Mass Cash cannot maintain an action in fraud based on the statement made by Comtrex regarding Dunkin' Donuts desire to exclude Mass Cash as it has failed to demonstrate any reliance on the falsehood. Accordingly, the Court *ALLOWS* Comtrex's motion for summary judgment on Count IV.

### 7. *Chapter 93A.*

▮▮▮▮ General Laws, ch. 93A, § 2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." To fall within the purview of chapter 93A, conduct between businessmen must be "(1) within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) ... immoral, unethical, oppressive, or unscrupulous.'" *Levings v. Forbes & Wallace,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979). The complained of conduct "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace,* 8 Mass.App.Ct. at 504, 396 N.E.2d 149.

Because the Court finds no tortious or otherwise unscrupulous activity on the part of Comtrex, the wrath of chapter 93A cannot be unleashed. Summary judgment on Count V is therefore *ALLOWED.*

### ORDER

For the foregoing reasons, defendant Comtrex's motion for summary judgment (Docket No. 28) is *ALLOWED* on Counts I, II, IV and V. Defendant's motion for summary judgment on Count III is *DENIED.* Plaintiff may amend its complaint to assert a quantum meruit claim within twenty days.