41 F.3d 1251
 25 UCC Rep.Serv.2d 517
 Gary S. HOLMES, Plaintiff-Appellant,
v.
Marlin F. TORGUSON, Mardi Gras Casino Corp., Delta Casino
Corp., Defendants-Appellees.
DELTA CASINO CORP., Counterclaim Plaintiff-Cross-Appellant,
v.
Gary S. HOLMES, Commercial State Bank of Minnesota,
Counterclaim Defendants-Cross-Appellees.
 Nos. 93-3529, 93-3532.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1994.
Decided Dec. 7, 1994.
 
 Robert J. Tansey, Jr., Minneapolis, MN, argued (David E. Oslund and Thomas J. Undlin, on the brief), for Gary S. Holmes.
 Gregory Lee Wilmes, Minneapolis, MN, argued (Mark J. Briol, on the brief), for Mardi Gras Corp. and Delta Casino Corp.
 Jerome S. Rice, Minneapolis, MN, argued (Mark V. Steffenson, on the brief), for Marlin F. Torguson.
 Before BOWMAN, Circuit Judge, WEIS,* Senior Circuit Judge, and LOKEN, Circuit Judge.
 LOKEN, Circuit Judge.
 
 
 1
 In this diversity action, Gary Holmes seeks damages equal to one-half of Marlin Torguson's equity interest in a lucrative gaming enterprise. Holmes's claim is based on the alleged wrongful termination of an oral joint venture agreement. The district court[1] granted summary judgment dismissing Holmes's claims, primarily on the ground that the alleged agreement is unenforceable under the statute of frauds in Article 8 of the Minnesota Uniform Commercial Code, Minn.Stat. Sec. 336.8-319. Holmes appeals. Having considered any disputed facts most favorably to Holmes, and the grant of summary judgment de novo, we affirm.
 
 I.
 
 2
 On May 21, 1991, Holmes and Torguson held a long meeting in Holmes's office. At the time, Torguson was a multi-state developer and manager of casinos and gaming operations whose partner was looking to retire. Holmes was a developer and investor looking for opportunities. Over the next several months, Holmes and Torguson engaged in a number of cooperative activities. Holmes lent $309,000 to Atlantic-Pacific Corporation ("A-P"), a Torguson-owned company then operating a casino in Deadwood, South Dakota; Holmes received promissory notes from A-P and Torguson's written personal guaranty. Holmes lent another $250,000 to Delta Casino Corporation ("Delta"), a Torguson-owned company formed to develop riverboat casinos in Mississippi. This loan was for a deposit on two barges to be converted into casinos. Holmes again received a promissory note from Delta and Torguson's written guaranty. Holmes also arranged for Commercial State Bank of Minnesota to lend Delta $5,250,000 to complete purchase of the barges.[2] Holmes and his in-house architect and financial advisor also spent considerable time, effort, and money attempting to develop casino sites in Mississippi for Delta and for Mardi Gras Casino Corporation ("Mardi Gras"), another Torguson-owned company. Concurrent with these development activities, Torguson pressed pending applications to the Mississippi Gaming Commission for Delta and Mardi Gras gaming licenses and helped Holmes apply for approval as a suitable person to acquire an ownership interest in these prospective licensees.
 
 
 3
 By mid-November, Holmes was frustrated with the lack of progress. To get Torguson's attention, Holmes demanded payment of the loans to A-P and Delta and commenced a collection action in Minnesota state court against those corporations and Torguson as personal guarantor. However, for the next three months, Holmes and Torguson continued to cooperate, though to little real effect. Holmes's in-house staff kept working on the potential Mississippi casino sites. The attorneys for Holmes and Torguson exchanged proposals to reduce their complex relationship to a written agreement. And the parties submitted additional applications to the Mississippi Gaming Commission stating that Torguson had granted Holmes an option to buy fifty percent of the stock of Delta and Mardi Gras upon issuance of gaming licenses approving Torguson and Holmes as owners.
 
 
 4
 Holmes and Torguson never signed a written agreement reflecting their relationship. In March 1992, Torguson found another source of financing, repaid Holmes's loans to A-P and Delta, advised the Mississippi Gaming Commission to withdraw Holmes's suitability applications, and declared an end to the relationship. Holmes immediately commenced this action, seeking to compel Torguson to perform an alleged joint venture and to obtain other relief. On April 29, 1992, the Gaming Commission issued Torguson a license, and Mardi Gras opened a casino that summer. Torguson subsequently transferred his stock in A-P, Delta, and Mardi Gras to a new holding company, Casino Magic Corporation, and made a successful public offering of Casino Magic stock. The value of Torguson's shares in that company grew to more than $150,000,000.
 
 
 5
 Following extensive discovery, the district court granted summary judgment dismissing all of Holmes's claims. After thorough analysis, the court concluded that in essence this is a suit to enforce an oral agreement by Torguson to sell fifty percent of the stock in his gaming corporations to Holmes; that the relevant documents are insufficient to satisfy the Sec. 8-319 statute of frauds; that the alleged joint venture is therefore unenforceable; and that the claim for unjust enrichment fails because Holmes seeks to recover primarily his costs of investigating an investment opportunity, and any incidental benefits to Torguson "are not so great as to rise to the level of unjust enrichment."
 
 II.
 
 6
 This appeal raises issues that turn on the precise nature of the alleged oral agreement. That agreement is described by Holmes as follows:
 
 
 7
 After a series of intense discussions spanning a number of months, on May 21, 1991 Holmes and Torguson agreed to pursue gaming operations in Mississippi, South Dakota and elsewhere throughout the United States as joint venturers and partners. Holmes and Torguson agreed that: (1) Holmes would own a one-half interest in the Mississippi gaming operations (Mardi Gras and Delta) and the South Dakota gaming operation (Atlantic Pacific); (2) Holmes and Torguson would be 50-50 partners in those operations and any others they developed; (3) Holmes would contribute equity of $3 million to the Joint Venture on a subordinated loan basis; (4) Holmes' $3 million would be paid back, if at all, out of cash flow from operations; and (5) Holmes would immediately loan Atlantic-Pacific money to help it pay its contracts in South Dakota.
 
 
 8
 (Brief of Appellant, p. 2.) In May 1991, when Holmes and Torguson allegedly entered into this agreement, Mardi Gras, Delta, and A-P were existing corporations with outstanding stock owned by Torguson. Thus, the district court correctly held that the initial term of the alleged joint venture--"Holmes would own a one-half interest in" those corporations--necessarily encompassed an oral agreement to transfer corporate stock.[3]
 
 
 9
 Section 8-319 of the Minnesota Uniform Commercial Code, Minn.Stat. Sec. 336.8-319, provides:
 
 
 10
 A contract for the sale of securities is not enforceable by way of action or defense unless
 
 
 11
 (a) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;
 
 
 12
 (b) delivery of a certificated security or transfer instruction has been accepted ... or payment has been made ...;
 
 
 13
 (c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and the recipient has failed to send written objection to its contents within ten days after its receipt; or
 
 
 14
 (d) the party against whom enforcement is sought admits in pleading, testimony, or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.
 
 
 15
 In this case, there is no writing signed by Torguson, no delivery of stock or acceptance of payment, and no written confirmation of sale that would satisfy Sec. 8-319(a), (b), or (c). Thus, Holmes must find a way to avoid application of this statute or the most essential term of the alleged oral agreement is unenforceable.
 
 A.
 
 16
 Holmes first asserts that he has alleged the elements of a joint venture, and an oral joint venture is enforceable under Minnesota law, even if it includes the transfer of property that normally falls within a statute of frauds. Holmes cites Anderson v. Property Developers, Inc., 555 F.2d 648 (8th Cir.1977), but Anderson merely stands for the well-settled principle that a statute of frauds does not apply to an oral joint venture to engage in future transactions subject to the statute, such as purchases and sales of real property or securities. As the district court noted, this case is different--Holmes alleges an oral agreement to transfer one-half of the stock of A-P, Delta, and Mardi Gras from Torguson to Holmes. That agreement falls squarely within Sec. 8-319. "[T]he label 'joint venture' will not remove the bar of the statute when, as here, the very essence of the asserted venture is a sale from one 'venturer' to the other." Backus Plywood Corp. v. Commercial Decal, Inc., 317 F.2d 339, 342 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963); see Franklin Auto Body Co. v. Wicker, 414 N.W.2d 509, 512-13 (Minn.App.1987); Dobbs v. Vornado, Inc., 576 F.Supp. 1072, 1076-77 (E.D.N.Y.1983).
 
 B.
 
 17
 Holmes next asserts that various documents in the record, read together, satisfy the writing requirement of Sec. 8-319. For several writings to satisfy the statute of frauds collectively, they must refer to one another or be connected by internal evidence so clear that parol evidence is not needed to establish their relationship to the contract. Quinn-Shepardson Co. v. Triumph Farmers' Elevator Co., 149 Minn. 24, 182 N.W. 710, 711 (1921). To satisfy the statute of frauds, "one cannot bootstrap a skimpy writing into an adequate one with oral evidence." Vess Beverages, Inc. v. Paddington Corp., 941 F.2d 651, 656 n. 6 (8th Cir.1991).
 
 
 18
 Holmes cannot meet this rigorous standard. He relies upon documents that were written at different times under differing circumstances, that do not refer to one another, and that do not purport to be part of a single contract. We agree with the district court that "[Holmes] cannot pick out bits and pieces from a multitude of documents, ignore the inconsistencies between them, and assert they form a contract." Moreover, Holmes fails to identify any document that was signed by Torguson and that "indicate[s] that the signature was affixed for the purpose of becoming charged with the obligations of a contract." Quinn-Shepardson Co., 182 N.W. at 711. He cites amended applications to the Mississippi Gaming Commission referring to the grant of stock options; however, these documents neither contain sufficient information to describe a complete agreement nor indicate on their face Torguson's intent to be bound by the alleged joint venture.
 
 C.
 
 19
 Holmes next argues that Torguson judicially admitted the alleged joint venture in his answer to Holmes's state court collection action, thereby satisfying Sec. 8-319(d). See Oskey Gasoline & Oil Co. v. Continental Oil Co., 534 F.2d 1281 (8th Cir.1976). We disagree. Those pleadings addressed a different dispute, alleged or admitted a different relationship, and did not admit, as Sec. 8-319(d) requires, that "a contract was made for sale of a stated quantity of described securities at a defined or stated price."
 
 D.
 
 20
 Finally, Holmes contends that Torguson is equitably estopped to deny an enforceable joint venture because he took the benefits of Holmes's substantial out-of-pocket expenditures and other assistance. Under Minnesota law, equitable estoppel applies to other statutes of frauds and to other UCC provisions. See Berg v. Carlstrom, 347 N.W.2d 809, 812 (Minn.1984) (land transfers); Del Hayes & Sons, Inc. v. Mitchell, 304 Minn. 275, 230 N.W.2d 588, 594 (1975) (sales of goods); Fronning v. Blume, 429 N.W.2d 310, 314 (Minn.App.1988) (credit agreements). We believe that the Minnesota Supreme Court would apply equitable estoppel to Sec. 8-319 as well. See generally Wieberg v. Resthaven Gardens of Memory, Inc., 759 F.Supp. 687 (D.Kan.1991).
 
 
 21
 However, to avoid the statute of frauds by equitable estoppel requires proof of a misrepresentation or concealment of material fact "akin to fraud." Del Hayes, 230 N.W.2d at 595. It also requires proof of detrimental reliance of greater "character and magnitude" than is normally incident to an oral contract. Sacred Heart Farmers Coop. Elevator v. Johnson, 305 Minn. 324, 232 N.W.2d 921, 923 (1975). When a statute of frauds would otherwise apply, equitable estoppel "should be carefully and sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity." Poksyla v. Sundholm, 259 Minn. 125, 106 N.W.2d 202, 204 (1960).
 
 
 22
 The undisputed facts of record establish neither a fraudulent misrepresentation by Torguson, nor reasonable reliance by Holmes on any representations that were made, that could meet the strict requirements of equitable estoppel under Minnesota law. Holmes argues that the substantial work he performed in furtherance of the venture plus Torguson's judicial admission of a joint venture in the collection suit give rise to an equitable estoppel. But Holmes was a sophisticated investor who was advised by counsel throughout the course of his dealings with Torguson. Holmes required written documentation of his substantial loans to A-P and Delta. His attorneys drafted a number of proposed written agreements to reflect the overall relationship, none of which resembled the oral agreement alleged on this appeal, and none of which was signed by Torguson. Moreover, any agreement between Holmes and Torguson was necessarily contingent upon the Mississippi Gaming Commission approving both Torguson and Holmes as suitable owners of gaming enterprises in that State, which required submission and approval of a written agreement.[4] This case does not present "clear and satisfactory grounds of justice and equity" for an estoppel.
 
 
 23
 For the foregoing reasons, we agree with the district court that the central term of the oral agreement alleged by Holmes falls within the Sec. 8-319 statute of frauds, and therefore the entire agreement is unenforceable. This is hardly a startling conclusion. As the Second Circuit observed in affirming the grant of summary judgment in R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984):
 
 
 24
 Perhaps most telling is the fact that the parties were talking about an initial investment of some two million dollars, and that plaintiff's complaint alleges lost income, profits, and injuries of "at least" eighty million dollars. With the amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone.
 
 III.
 
 25
 There remain to be considered Holmes's claims for relief other than transfer of one-half of Torguson's equity in the gaming enterprises. Two of these contentions require little discussion. Holmes's claim that he is entitled to reimbursement of out-of-pocket expenses as damages "incurred when performing under the Joint Venture" falls with his claim of an enforceable joint venture. Likewise, his claims that Torguson breached a fiduciary duty and wrongfully terminated a partnership fail because there was no partnership and, accordingly, no fiduciary relationship arising out of these arms-length business dealings.
 
 
 26
 That leaves Holmes's claim that he is entitled to "the value of his one-half interest in the gaming enterprises ... at least $82,650,000 and perhaps as much as $165,300,000" under a theory of unjust enrichment. Under Minnesota law,
 
 
 27
 [t]he theory of unjust enrichment or money had and received has salutary and beneficial uses and has been invoked in support of claims based upon failure of consideration, fraud, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another.
 
 
 28
 Cady v. Bush, 283 Minn. 105, 166 N.W.2d 358, 361-62 (1969). Minnesota law allows unjust enrichment relief to parties who benefit others by making improvements to property or rendering services in reliance on a contract that is unenforceable under the statute of frauds. See Tompkins v. Sandeen, 243 Minn. 256, 67 N.W.2d 405, 409 (1954).
 
 
 29
 We nonetheless conclude that defendants are entitled to summary judgment dismissing Holmes's unjust enrichment claim for two distinct reasons. First, to ensure that unjust enrichment is not used to reward a bad bargain, Minnesota courts require proof that "a benefit was conferred unknowingly or unwillingly." Galante v. Oz, Inc., 379 N.W.2d 723, 726 (Minn.App.1986). Similarly, "no recovery can be had for preliminary services that are performed with a view to obtaining business through a hoped for contract." Maple Island Farm, Inc. v. Bitterling, 209 F.2d 867, 872 (8th Cir.) (applying Minnesota law), cert. denied, 348 U.S. 882, 75 S.Ct. 123, 99 L.Ed. 694 (1954). As the district court noted, Holmes's front-end development expenditures were made primarily for his own benefit. Any long-term benefit conferred on Torguson or his companies was incidental to Holmes's primary purpose of advancing his own investment opportunities. Nor is it "morally wrong" for Torguson to retain these incidental benefits. Except for the loans to A-P and Delta, Holmes made a conscious decision to invest time and money without a written contract, thereby accepting the risks of an at-will relationship.
 
 
 30
 Second, Holmes seeks relief that is not obtainable under the doctrine of unjust enrichment. The unjust enrichment remedy for one who partially performed an unenforceable contract is limited to "the value of the services rendered less the benefits received thereunder." Pfuhl v. Sabrowsky, 211 Minn. 439, 1 N.W.2d 421, 422 (1941). As Holmes does not request that relief, his unjust enrichment claim must be dismissed. See Cooley v. Major Media Mgmt. Corp., 402 N.W.2d 815, 817-18 (Minn.App.1987).
 
 
 31
 We have carefully considered Holmes's remaining contentions and conclude they are without merit. Delta has asked that its cross-appeal be dismissed if we affirm the district court's dismissal of Holmes's claims. Accordingly, the judgment of the district court is in all respects affirmed.
 
 
 
 *
 The HONORABLE JOSEPH F. WEIS, JR., Senior United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 The HONORABLE DIANA E. MURPHY, then Chief Judge of the United States District Court for the District of Minnesota, now United States Circuit Judge for the Eighth Circuit
 
 
 [2]
 Later in 1991, Holmes instructed Commercial State Bank not to fund these loans, and Delta forfeited its $250,000 down payment, which is the basis for Delta's counterclaim and cross-appeal
 
 
 [3]
 Holmes argues that Mardi Gras and Delta were mere "vehicles" whose corporate form was irrelevant to the parties' intent to share equally in all gaming operations. However, the businesses to be jointly controlled and the profits to be shared by the alleged joint venture were owned by these corporations. Unless Torguson transferred stock to Holmes, Holmes would lack the proprietary interest that is necessary to prove a joint venture. See Rehnberg v. Minnesota Homes, Inc., 236 Minn. 230, 52 N.W.2d 454, 457 (1952)
 
 
 [4]
 The Executive Director of the Commission testified that, to be lawful, any agreement that would change the ownership in Mardi Gras or Delta must be submitted to the Commission in writing for approval. That is another reason why the oral contract alleged by Holmes is unenforceable