64 F.3d 422
 Susan GALLINGER, Arizona Director of Insurance, as Receiver
of Great Global Assurance Company, Appellant,
v.
NORTH STAR HOSPITAL MUTUAL ASSURANCE, LTD., A Bermuda
Company, Defendant,
and
Allen Memorial Hospital; Finley Hospital; Hancock County
Memorial Hospital; Jackson County Public Hospital;
Jefferson County Hospital; Sartori Memorial Hospital;
Spencer Municipal Hospital; Covenant Medical Center, Inc.,
Successor to St. Francis Hospital; Abbott Northwestern
Hospital, Inc., Successor to Eitel Hospital; Albany Area
Hospital, Formerly Known as Albany Community Hospital;
Samaritan Bethany, Inc., Formerly Known as Bethany
Samaritan, Inc.; Douglas County Hospital; Elders' Home,
Inc.; Elim Homes, Inc.; Fairfax Community Home, Inc.;
Fairmont Community Hospital Association, Inc.; Foundation
of Guardian Angels; Gillette Children's Hospital; Glenwood
Retirement Home; Grandview Christian Home; Green Pine
Acres Nursing Home; HealthEast, Formerly Known as Health
Resource Center, Inc.; Immanuel-St. Joseph's Hospital of
Mankato; All Health Corporation, Formerly Known as King
Care Centers, Inc.; Lakeview Memorial Hospital Association,
Inc.; Lyngblomsten Care Center, Inc.; Lac Qui Parle Health
Care Services, Formerly Known as Madison Hospital
Association; Mercy Hospital and Health Care Center,
Formerly Known as Mercy Hospital and Nursing Home;
Methodist Hospital; Metropolitan-Mount Sinai Medical
Center, Owned by HealthOne Corporation, Successor to
Metropolitan Medical Center, Also Known as Centercare, and
to Mount Sinai Hospital; Minneapolis Children's Medical
Center; Monticello-Big Lake Community Hospital; North
Country Hospital, Formerly Known as Bemidji Community
Hospital; Riverview Healthcare Association, Formerly Known
as Riverview Hospital; Seminary Memorial Home; Shady Lane
Nursing Home; St. John's Regional Health Center, Formerly
Known as St. John's Hospital; St. Luke's Hospital of
Duluth; St. Therese Home Auxiliary; United District
Hospital and Home; United Hospital Incorporated; Villa of
St. Francis Nursing Home; Ridgeview Medical Center,
Formerly Known as Waconia Ridgeview Hospital; Watonwan
Memorial Hospital; Weiner Memorial Medical Center, Inc.;
Wood Dale Home, Inc.; Bozeman Deaconess Hospital; C-M
Medical Facilities, Inc., Owner of Central Montana Medical
Center, Formerly Known as Central Montana Hospital and
Nursing Home; Garfield County Health Center, Inc., Formerly
Known as Garfield County Hospital and Home Association;
Glendive Medical Center, Formerly Known as Glendive
Community Hospital; and Holy Rosary Hospital, Appellees,
and
Liberty County Hospital, Defendant,
and
Northern Montana Hospital; Montana Children's Home and
Hospital, Owner of Shodair Children's Hospital; St. John's
Lutheran Hospital, Libby, Montana; St. Patrick's Hospital;
St. Peter's Community Hospital; Brookings
Hospital/Brookview Manor; Dell Rapids Community Hospital;
Five Counties Hospital and Nursing Home; Hand County
Memorial Hospital; Mobridge Regional Hospital; Pioneer
Memorial Hospital; Platte Community Memorial Hospital,
Inc.; Rushmore Health System, Inc., Successor to Rapid City
Regional Hospital; Sioux Valley Hospital Association; St.
Benedict Hospital; and St. Michael's Hospital, Inc., Appellees.
 No. 94-2617.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1995.
Decided Aug. 29, 1995.
 
 Joseph Anthony, Minneapolis, MN, argued (Mary L. Knoblauch and Douglas L. Elsass, on the brief), for appellant.
 Eric Magnuson, Minneapolis, MN, argued (Richard J. Nygaard, Thomas J. White and Thomas J. Hoben, on the brief), for appellees.
 Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 In 1978, a group of 13 hospitals formed North Star Hospital Mutual Assurance, Ltd. (NSHMA), an entity through which they intended to insure themselves for malpractice and other types of general liability. Membership in the company, which was incorporated in Bermuda, later grew to almost 250 hospitals and nursing homes.
 
 
 2
 Although the NSHMA members did not hold shares of stock in the company, the members were subject to various Bermuda statutes that treated those members in a manner analogous to shareholders in a corporation. For instance, under the legislation authorizing the formation of the company in Bermuda, the "liability of each member ... [was] limited to the premiums or any unpaid ... portion thereof, due" to the company. Under that same legislation, no member was to be required to "pay any dues or assessments in addition to such premiums"; rather, "the property and assets" of the company were to be "liable for its debts and liabilities."
 
 
 3
 Under the legislation authorizing the formation of the company in Bermuda, the members of the company were granted the power to approve a set of bylaws proposed by the company's initial board of directors. Under that same legislation, the members were also given the power to "revoke, alter, amend or add to" the bylaws by resolution. The original bylaws for NSHMA provided that each member's base premium could be increased by up to 100 percent in any particular year, depending upon that member's insurance losses for that year (those increases were called general and specific experience modifiers). In 1981, however, the members of NSHMA, through a resolution passed at a general meeting, deleted the provision allowing for experience modifiers from the bylaws of the company.
 
 
 4
 In mid-1983, a company called Great Global Assurance (GGA) began providing workers' compensation insurance to NSHMA members. NSHMA agreed to be GGA's reinsurer for claims under GGA policies. In early 1986, however, an Arizona state court placed GGA into receivership because of insolvency; the receiver for GGA then canceled all insurance policies that had been issued by GGA.
 
 
 5
 For payment of claims, GGA policyholders turned as an alternative to the various insurance guaranty funds of the states in which the policyholders were located. Those insurance guaranty funds sought to recover their own payments of over $15 million from the receiver for GGA. In response, in mid-1991, the receiver for GGA sued NSHMA and 67 of its members in federal district court in Minnesota. The complaint alleged that NSHMA was the reinsurer for GGA's policies and therefore that NSHMA and its members were liable to GGA for the amounts sought by the state insurance guaranty funds from the receiver for GGA. The complaint contended that the NSHMA members could be held individually liable for the debts of NSHMA itself because "NSHMA was a mere instrumentality and alter ego of the ... defendants" and that the defendants "conducted, managed and controlled the affairs of NSHMA as though NSHMA was their own business." (The receiver for GGA sought relief against the NSHMA members on account of the fact that NSHMA itself was--and is--insolvent.)
 
 
 6
 The complaint asserted claims for breach of contract, civil conspiracy, promissory estoppel, and unjust enrichment. The receiver for GGA asked for $15 million in damages. In 1993, on motions for summary judgment, the district court dismissed the claims of promissory estoppel and unjust enrichment against the NSHMA members. In 1994, on motions for summary judgment, the district court dismissed the remaining claims of breach of contract and civil conspiracy against the NSHMA members. Subsequently, the district court entered a partial final judgment on all claims in favor of the NSHMA members and certified the judgment for appeal. See Fed.R.Civ.P. 54(b). The receiver for GGA appeals. We affirm the district court.[1]
 
 I.
 
 7
 We turn first to the promissory estoppel claim. The district court held that the receiver for GGA had failed to establish the existence of a genuine issue of material fact with respect to whether the NSHMA members had promised to pay NSHMA's debts if NSHMA itself was unable to do so (specifically, in this case, NSHMA's reinsurance obligations to GGA), and therefore that the NSHMA members were entitled to summary judgment on the claim for promissory estoppel.
 
 
 8
 In doing so, the district court rejected the affidavit of Allin Karls, the chairman of GGA during the relevant time; Mr. Karls is also the chairman of the company that had contracted to handle "claims, loss control, underwriting and administrative services" for NSHMA. The district court held that Mr. Karls's affidavit about promises allegedly made by the NSHMA members was not specific enough to defeat the motions for summary judgment, since the affidavit did not identify which particular NSHMA members made the alleged promises, did not describe the specific nature of the alleged promises, and included no details about the persons who allegedly made the promises or the circumstances under which the alleged promises were made.
 
 
 9
 On appeal, the receiver for GGA disputes the district court's conclusions about Mr. Karls's affidavit and points to other evidence submitted that, according to the receiver, established a genuine issue of material fact with respect to promises allegedly made by the NSHMA members to cover debts such as the reinsurance obligations of NSHMA to GGA. We have examined the evidence to which the receiver for GGA directs us--an affidavit dated late 1992 from Mr. Karls; an affidavit dated late 1992 from Michael Miller, a vice-president for GGA until it went into receivership, and a marketing vice-president until early 1983 for the administrative services company headed by Mr. Karls; and an affidavit dated late 1992 from James Groves, an expert in "hospital-owned insurance companies."
 
 
 10
 It is true that Mr. Karls asserted that "if there were not enough funds to pay claims, the founding hospitals knew that they would be liable for the amounts over and above NSHMA's payments"; that it was his "understanding" that "the hospital members would be responsible for losses" to NSHMA; that "[t]his was discussed at NSHMA board meetings"; and that "hospital administrators of NSHMA members assured [him] that ... the hospitals would contribute the money to pay the losses." It is also true that Mr. Miller asserted that one of the NSHMA members, for which he worked before becoming associated with the administrative services company headed by Mr. Karls, "was willing to accept [the] risk [that] ... if [sufficient] funds were not available to pay its claims then [that NSHMA member] would have to make up the difference," and that the president of NSHMA told him in late 1985 that the "NSHMA members were committed to ... contributing more capital." Finally, it is true that Mr. Groves asserted that "the hospitals [in self-insuring organizations such as NSHMA] had committed their substantial financial resources to insuring their own risks ... [by] assuming the responsibility of taking care of their own losses"; that it was his "understanding" that "the participating hospitals [in such organizations] were responsible for paying their own collective losses"; and that he "had many discussions with hospital administrators about the way [that] participating hospitals [in such organizations] were responsible for the group's own risks and losses."
 
 
 11
 These affidavits fall short of raising a genuine issue of material fact on the question of whether the NSHMA members made promises to make contributions to NSHMA. In the first place, two of them make assertions only about what the affiant "understood," without linking that understanding to any statements made by the NSHMA members. More importantly, such affidavits as do relate statements by the NSHMA members do not identify the persons who made them. The alleged statement by NSHMA's president that "NSHMA members were committed to ... contributing more capital" is simply too vague for us to conclude that a promise was intended. It does not indicate, for instance, which NSHMA members were so committed and how long the alleged commitment was supposed to continue. It does not even say that the commitment was not revocable.
 
 
 12
 Under these circumstances, we agree with the district court that the affidavits submitted by the receiver for GGA were insufficient to establish the existence of a genuine issue of material fact on the question of whether the NSHMA members made promises to pay debts such as the reinsurance obligations of NSHMA to GGA. See, e.g., El Deeb v. University of Minnesota, 60 F.3d 423, 428-429 (8th Cir.1995); see also Fed.R.Civ.P. 56(e). We therefore affirm the district court's order granting summary judgment to the NSHMA members on the promissory estoppel claim. (We note, as well, that even considering additional evidence that was submitted later to the district court, we would still affirm the district court's grant of summary judgment to the NSHMA members on the claim of promissory estoppel.)
 
 II.
 
 13
 The essence of the claim for unjust enrichment was that the NSHMA members received the benefits of their insurance policies through GGA when they looked to the state insurance guaranty funds upon GGA's insolvency, despite the fact that a principal reason for GGA's insolvency was the NSHMA members' own refusal--in defiance of alleged earlier promises--to contribute sufficient money to allow NSHMA to pay debts such as its reinsurance obligations to GGA. To prove a claim of unjust enrichment under Minnesota law, however, a plaintiff must show not simply that "one party benefit[ed] from the efforts or obligations of others, but ... that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully," First National Bank v. Ramier, 311 N.W.2d 502, 504 (Minn.1981) (en banc ), or that the circumstances were such that "it would be morally wrong for one party to [be allowed to] enrich himself at the expense of another," Cady v. Bush, 283 Minn. 105, 166 N.W.2d 358, 361-62 (1969) (en banc ); see also Holmes v. Torguson, 41 F.3d 1251, 1256 (8th Cir.1994) (interpreting Minnesota law).
 
 
 14
 The district court held that the receiver for GGA had failed to establish the existence of a genuine issue of material fact on the question of the illegality or immorality of the actions of the NSHMA members. On appeal, the receiver for GGA argues that sufficient evidence was presented of both illegal and immoral actions by the NSHMA members.
 
 
 15
 With respect to the alleged illegality of those actions, the receiver for GGA cites an affidavit dated late 1992 from Jan Woloniecki, a lawyer in Bermuda. It is true that Mr. Woloniecki stated in his affidavit that, in his opinion, the NSHMA members' failure to contribute additional money to NSHMA violated Bermuda law. As the district court pointed out, however, the receiver for GGA has not shown that Bermuda law should apply to this case (or, we note, that Mr. Woloniecki's assertions about the effect of Bermuda law are accurate).
 
 
 16
 With respect to the alleged immorality of the actions of the NSHMA members, the receiver for GGA asserts that a jury could decide that it was immoral for the NSHMA members to promise to contribute sufficient money to cover debts such as the reinsurance obligations of NSHMA to GGA and then to violate those promises, all the while benefiting personally from the payment by the state insurance guaranty funds for insurance claims made on behalf of the NSHMA members. That assertion, however, ignores the fact that the receiver for GGA has failed to provide enough evidence to defeat the motions for summary judgment on the question of whether such promises were ever made.
 
 
 17
 Under all of these circumstances, we agree with the district court that the receiver for GGA failed to establish the existence of a genuine issue of material fact on the unjust enrichment claim. We therefore affirm the district court's grant of summary judgment to the NSHMA members on that claim. (We note, as well, that even considering additional evidence that was submitted later to the district court, we would still affirm the district court's grant of summary judgment to the NSHMA members on the claim of unjust enrichment.)
 
 III.
 
 18
 The district court initially denied summary judgment on the claims for breach of contract and civil conspiracy, stating that the record as it appeared at the time of the first summary judgment motions did not show that the NSHMA members were entitled to prevail on those claims. By a year later, however, both the receiver for GGA and the NSHMA members had submitted additional evidence. At that time, the district court granted summary judgment to the NSHMA members on the two remaining claims. We therefore evaluate that ruling in light of all of the evidence submitted at that point.
 
 
 19
 The essence of the contract claim was that NSHMA's failure to pay GGA under the reinsurance contract was a breach of that contract and that, because NSHMA itself was a "mere instrumentality and alter ego" of the NSHMA members, it was appropriate to hold the NSHMA members liable for the debts of NSHMA and to disregard the fact that NSHMA was a corporate entity (i.e., it was legally proper to "pierce the corporate veil"). See, e.g., Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn.1979) (en banc ); see also Minnesota Power v. Armco, Inc., 937 F.2d 1363, 1367-68, 1368 n. 6 (8th Cir.1991) (interpreting Minnesota law).
 
 
 20
 Significant considerations in determining whether disregard of the corporate form is justifiable under Minnesota law include "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, ... insolvency of [the] corporation at [the] time of [the] transaction in question, siphoning of funds by dominant [NSHMA members], nonfunctioning of ... officers and directors, absence of corporate records, and existence of [the] corporation as merely [a] facade for individual dealings.... Disregard of the corporate entity requires not only that a number of [those] factors be present, but also that there be an element of injustice or fundamental unfairness." Victoria Elevator Co., 283 N.W.2d at 512. To satisfy that element, " 'proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented.' " White v. Jorgenson, 322 N.W.2d 607, 608 (Minn.1982) (en banc ), quoting West Concord Conservation Club, Inc. v. Chilson, 306 N.W.2d 893, 898 n. 3 (Minn.1981) (en banc ).
 
 
 21
 The district court held that assuming arguendo the existence of a genuine issue of material fact on the questions of capitalization, corporate formalities, insolvency at the relevant time, siphoning of funds, officers and directors, corporate records, and facade, the receiver for GGA had failed to provide sufficient evidence to establish the existence of a genuine issue of material fact on the question of injustice or fundamental unfairness. In doing so, the district court rejected additional affidavits dated late 1993 from Mr. Karls and Mr. Miller. The district court stated that those affidavits were insufficient to defeat the motions for summary judgment in light of the NSHMA members' own affidavits, dated fall, 1993, specifically denying that they made any promises to cover debts such as NSHMA's reinsurance obligations to GGA.
 
 
 22
 On appeal, the receiver for GGA disputes those conclusions of the district court and cites other evidence submitted that, according to the receiver, established a genuine issue of material fact with respect to the injustice or fundamental unfairness of not holding the NSHMA members individually liable for NSHMA's corporate obligations. We have examined all of the evidence to which the receiver for GGA directs us (including exhibits that, inexplicably, were not submitted to this court but were contained in the district court file)--multiple affidavits dated 1992 and 1993; multiple depositions dated 1992 and 1993; and minutes of meetings, various letters, and multiple miscellaneous documents dated 1977 through 1986.
 
 
 23
 We see nothing that establishes a genuine issue of material fact with respect to the question of whether it would be unjust or fundamentally unfair not to hold the NSHMA members individually liable in this case. In our view, all of the exhibits show that the liability of the NSHMA members was limited from the start by the legislation authorizing the formation of the company in Bermuda, that both Mr. Karls and Mr. Miller attended the general meeting of the NSHMA members at which the experience modifiers (the only source of supplemental money addressed in the bylaws) were deleted from the bylaws, that amending the bylaws was completely lawful under the legislation authorizing the formation of the company in Bermuda, and that the only control of the company by any or all of the nearly 250 NSHMA members was through five representatives on the company's seven-person board of directors and through representatives on the various committees that worked with the administrative services company headed by Mr. Karls and sent recommendations to the NSHMA board of directors.
 
 
 24
 Indeed, the actual basis for the argument that it would be unjust or fundamentally unfair not to hold the NSHMA members liable for the corporate debts of NSHMA is the alleged promises made by the NSHMA members to pay debts such as the reinsurance obligations of NSHMA to GGA. Since we have already rejected the evidence of those promises as insufficient to defeat the motions for summary judgment, we see no grounds for holding, with respect to the question of alter ego, that those alleged promises would render inequitable a judgment for the NSHMA members.
 
 
 25
 The receiver for GGA also asserts, however, that the NSHMA members failed to comply with certain discovery orders, that such compliance would have provided additional evidence with respect to alter ego to support the contract claim, and therefore that the NSHMA members' failure to comply with those discovery orders should bar them from receiving summary judgment on the contract claim. See Fed.R.Civ.P. 56(f); see also Fed.R.Civ.P. 37(b)(2) and Fed.R.Civ.P. 37(d). The district court stated that the receiver for GGA had failed to specify either the particular evidence that would have been obtained through additional discovery or the relevance of that evidence to the question of alter ego. On appeal, the receiver for GGA directs us to documents in the record that, according to the receiver, contradict the district court's statements.
 
 
 26
 We have examined those documents (an affidavit, with exhibits, dated late 1993 from the lawyer representing the receiver for GGA). The only specifics about unproduced discovery that are contained in those documents, aside from cross-references to materials not submitted to this court (or at least not located anywhere obvious to us), are references to "interrogatory answers relating to outside insurance or risk management consultants employed" by the NSHMA members, "copies of hospital board minutes regarding discussions and decisions about NSHMA control and ownership," and "accounting records and financial statements" of the NSHMA members related to the NSHMA "program."
 
 
 27
 We do not consider relevant the "assessments and views" of "outside insurance consultants and accountants" regarding the "operation of NSHMA" and the "financial and legal obligations" of the NSHMA members to NSHMA. That is because the receiver for GGA has already submitted evidence that is much more directly related to the operation of NSHMA and the actions of its members. This court is (and the district court was) perfectly capable of determining whether that evidence itself establishes the existence of a genuine issue of material fact on the question of alter ego. The "assessments and views" of others might indeed be interesting, but they are not relevant to our determination.
 
 
 28
 The affidavit declared that "hospital board meeting minutes [already] produced ... have sometimes included candid discussions of the [NSHMA] program, including admissions that the hospital ... may be obligated to ... contribute further capital in order to properly operate the company." We have read all of the hospital board minutes to which the receiver for GGA directed us on the question of alter ego. We disagree with the receiver's characterization of the contents of those hospital board minutes and their relevance to the question of alter ego. Based on our own conclusions about the hospital board minutes, we hold that the possible usefulness of unproduced hospital board minutes was not sufficient to preclude summary judgment for the NSHMA members.
 
 
 29
 Finally, the affidavit gave no explanation of the necessity for production of additional "accounting records and financial statements" of the NSHMA members. In light of that fact and in light of the fact that the "accounting records and financial statements" already produced provide no basis, in our view, for the denial of summary judgment to the NSHMA members, we agree with the district court's decision to proceed absent the production of those materials. We therefore affirm the district court's grant of summary judgment to the NSHMA members on the question of alter ego and, accordingly, on the contract claim.
 
 
 30
 The civil conspiracy claim cannot survive independent of the causes of action already defeated. See, e.g., Harding v. Ohio Casualty Insurance Co., 230 Minn. 327, 41 N.W.2d 818, 824-26 (1950). We therefore affirm the district court's grant of summary judgment to the NSHMA members on that claim as well.
 
 IV.
 
 31
 For the reasons stated, we affirm the judgment of the district court.
 
 
 32
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 33
 I respectfully dissent. Contrary to the majority's construction of the evidence presented by the parties below, my review of the record convinces me that genuine issues of material fact exist as to whether the corporate veil should be pierced in this case. The critical issues presented in this case are whether the NSHMA member hospitals (1) exercised control of NSHMA; (2) knowingly undercapitalized NSHMA; and (3) made promises to Great Global that they would fund all the claims due under the North Star Program. In my view, the record presents sufficient evidence from which a jury could find that Great Global was a mere conduit for NSHMA's self-insurance plan, that NSHMA-member hospitals promised Great Global that they would make sufficient contributions to ensure payment on all North Star Program claims, and that the hospitals failed to honor that commitment.
 
 
 34
 Allin Karls' affidavits detail the formation of both companies and assert that the clear, well-publicized philosophy behind NSHMA was that, in all events, the member hospitals would fund the claims under the program. Karls describes a complex and costly committee structure whereby member hospitals were kept regularly informed of the day-to-day operations of NSHMA, including its capitalization. Moreover, Karls recounts conversations with more than fifty hospital administrators in which they "expressed to [Karls] their facilities' financial commitments to NSHMA." Appellant's App. at 40-41.
 
 
 35
 The Appellant's claims are also supported by the statements of representatives from some of the member hospitals. The affidavit of Michael Miller, representative of member hospital Metropolitan Medical Center ("MMC") in Minneapolis, describes how MMC joined NSHMA with its eyes wide open. According to Miller, MMC studied the insurance options carefully before determining that "the risk of NSHMA not being able to pay on [its] claims was minimal" and that, therefore, "MMC was willing to accept that risk knowing full well that if funds were not available to pay its claims then MMC would have to make up the difference." Appellant's App. at 50.
 
 
 36
 Finally, from the fact that NSHMA paid Great Global a fronting fee of 4.75% of the premiums generated by the North Star Program while itself reinsuring 90-95% of the related claims, a jury could certainly infer that Great Global was acting as a mere conduit for the insurance dealings of NSHMA. That, in combination with the evidence that the member hospitals controlled NSHMA and promised Great Global that it would fund the claims from the North Star Program, makes the granting of summary judgment improvident in this case.
 
 
 
 [1]
 The Honorable Diana E. Murphy, Chief Judge, United States District Court for the District of Minnesota. In October, 1994, Judge Murphy became Circuit Judge, United States Court of Appeals for the Eighth Circuit